BOUNMY LOUNNAPHANH, APPELLEE, V. MONFORT, INC., APPELLANT.

583 N.W. 2d 783

Filed August 4, 1998.   No. A-97-1070.

Richard R. Endacott, of Knudsen, Berkheimer, Richardson, Endacott & Routh, for appellant.

Rod Rehm for appellee.

HANNON, IRWIN, and INBODY, Judges.

HANNON, Judge.

In this workers' compensation case, the trial court awarded the plaintiff, Bounmy Lounnaphanh, permanent total disability for a back injury. The defendant, Monfort, Inc., appealed to the Worker's Compensation Court review panel and then to this court, alleging that the only medical evidence offered by Lounnaphanh to prove that his condition was caused by a work-related accident while employed by Monfort, that is, the records of several doctors that treated him, is insufficient as a matter of law to support the trial judge's findings. Monfort also alleges that the trial court erred in finding Lounnaphanh was totally and permanently disabled, because the evidence shows he could be competitively employed if he took English as a Second Language (ESL) courses. We conclude that the medical records contain opinions of the treating doctors sufficient to support the trial judge's findings on causation and that because there is con-

flicting evidence on whether Lounnaphanh is employable in view of his constant pain, his inability to speak English, and his inability to learn English, we cannot say the trial judge was clearly wrong. We therefore affirm.

We note the trial judge mentioned certain parts of the medical record in her analysis of the evidence but concluded that "[b]ased on the totality of the medical evidence presented, the Court finds the plaintiff has sustained" his burden on causation. The review panel concluded much the same thing. We do not assume the trial judge or the review panel based its opinion on just the items discussed in the opinion. The medical evidence is too voluminous to summarize, let alone to discuss as to the significance of all the evidence relevant to the issue of causation.

## SUMMARY OF EVIDENCE

At trial on November 6, 1996, Lounnaphanh was 48. Lounnaphanh was born in Laos, has only a fifth grade education, and does not speak English. Not only did Lounnaphanh use an interpreter to testify in court, he needed an interpreter to converse with the doctors who treated him.

Lounnaphanh testified that he was a soldier for several years and a refugee in Thailand for 10 years and that he then came to the United States. Lounnaphanh went to work for Monfort in Grand Island, Nebraska. As a meat trimmer, his job was to cut fat from the area of the heart and put it in a box, and when 50 or 60 pounds of fat accumulated, he would throw the fat away. In November 1992, Lounnaphanh was emptying a box when he felt a sharp pain. Through a demonstration and with the aid of the interpreter, Lounnaphanh related that he would hold the box of fat with both hands in front of himself. He would lift up the box, twist his body to one side, and throw the contents out. While in this process on November 16, Lounnaphanh felt a sharp pain while twisting his body to one side, and his back then started hurting. Lounnaphanh told his supervisor and was sent to the infirmary, where a nurse put a heating pad on his back. Lounnaphanh testified he had pain in his back and his left leg but that he did not have any such pain before he was injured. On February 14, 1994, Lounnaphanh's back was operated on, but the surgery did not make his back feel better. Lounnaphanh

tried to return to work in the summer of 1994, but was able to work for only 2 or 3 weeks. Lounnaphanh has not worked since July 1994, when he obtained a note from Dr. Joseph O'Hara stating that he should not work permanently.

Lounnaphanh continues to see Dr. Gordon Hrnicek for pain but is given only a drug prescription. Lounnaphanh takes six or eight pills per day. He takes two pills before he goes to sleep and sleeps for 3 or 4 hours before the pain wakes him up. Lounnaphanh then takes more pills. Lounnaphanh testified he takes pain pills every 3 or 4 hours during the day. Lounnaphanh stated the pills help his pain "a little" but that his back still hurts. Lounnaphanh must take food before he takes the pills or his stomach hurts. The pills make Lounnaphanh drowsy, and he then cannot drive. Lounnaphanh is not able to help around the house or yard, but he has gone to the store with his wife and carried a grocery bag weighing 3 or 4 pounds. At the time of trial, Lounnaphanh was taking more medicine than he did in April 1995. Lounnaphanh can sit for only 10 to 15 minutes without pain. The pain is from his shoulder down his back to his calves. Lounnaphanh testified the pain used to be in only one leg and that he now feels pain in both legs, but that the left leg hurts the most. Lounnaphanh stated his whole leg feels numb and tingly and that he has to take naps during the day because of the pain.

After Lounnaphanh stopped working for Monfort, he tried to learn English. Lounnaphanh went to the doctor because he had pain while going to school, and the doctor excused him from attending school. Lounnaphanh testified he wants to learn English, but that he cannot because his back hurts when he sits. During cross-examination, Lounnaphanh demonstrated how far he could bend forward and how far he could twist his shoulders.

*Medical Evidence on Causation.*

The evidence contains a "Claimant's Report," dated December 19, 1992, reporting a work-related incident on November 16 and stating Lounnaphanh saw Hrnicek, his family physician, on November 23. Over the next few years, Lounnaphanh was sent to several medical specialists and physical therapists. On February 14, 1994, O'Hara performed a hemilaminectomy with disk excision on Lounnaphanh. The only medical evidence to establish that the November 16, 1992, accident caused

Lounnaphanh's back condition is contained in the several medical records introduced at trial. We will summarize these records.

The court received Hrnicek's office notes, which show that on November 9, 1992, he saw Lounnaphanh for a cough. On November 23, handwritten notes state, "Acute L low back pain x 6 mos. . . . very tender SI jt. . . . Because of + TB→ x ray→ . . . RTC 12/14. Records copied & to Monfort." Hrnicek's notes contain more than 100 entries concerning Lounnaphanh and his complaints. The last visit recorded occurred on July 16, 1996, when Lounnaphanh received more refills of pain medication. The record contains many complaints of pain and shows Hrnicek wrote Lounnaphanh many prescriptions for Darvocet and other pain relievers. These notes do not contain any opinion as to causation.

Hrnicek's files contain a letter dated December 3, 1992, to another doctor in regard to a positive test for tuberculosis. In that letter, Hrnicek states he can attest that Lounnaphanh has been quite healthy over the last 3 years, with negative chest x rays. At the end of the letter, Hrnicek states Lounnaphanh has "an acute low back strain which has started to cause some sciatic pain." In a letter to Lounnaphanh, Hrnicek told him his liver enzymes were mildly elevated and that Hrnicek hopes Lounnaphanh is successful in seeing one of the doctors about his back.

The record contains copies of three notes on prescription notepaper from Hrnicek to an unknown addressee, presumably Monfort, concerning Lounnaphanh. One note, dated November 23, 1992, states, "Above may return to work 11/30/92. Dx: acute low back strain." Another such note, dated December 18, 1992, states, "Above may return to light duty 12/21/92." A note dated January 18, 1993, states, "Back is not improved. He needs to see an orthopedist please." A similar, but typed, note dated April 1, 1995, and addressed "To Whom It May Concern:" states that Lounnaphanh should not participate in physical therapy classes from March 7, 1995, and that he is unable to exercise or sit for extended periods of time due to pain.

Hrnicek's file also contains three "Doctor's Slips," which are forms with spaces to identify the company, the employee, the

date of the injury, the patient's problem, the diagnosis, whether the complaint is occupational or nonoccupational, and the doctor's order regarding duty restriction or hospitalization. Hrnicek's file contains three such forms from Hrnicek to Monfort with Lounnaphanh listed as the employee concerned. Each form lists the date of the injury as November 16, 1992; shows Lounnaphanh has back problems; and contains a diagnosis of either chronic back strain, acute low back strain, or "acute LBS." On each slip, the prepared boxes were marked so as to clearly indicate Lounnaphanh's back complaint was occupational rather than nonoccupational. The form ends with a line for the doctor's signature, and initials appearing to be Hrnicek's appear on that line on each form. Russell Albee, the head of Monfort health service, identified the form dated January 18, 1993, as being a doctor's slip that Monfort uses to make decisions about work restrictions and workers' compensation benefits.

The record contains a letter dated June 14, 1993, from Dr. Lyal G. Leibrock to Dr. Ramon R. Salumbides. Leibrock, an associate professor of adult neurological surgery at the University of Nebraska Medical Center, first gives a short medical history for Lounnaphanh and then states, "My impression was that [Lounnaphanh] injured his back while at work lifting a box in November 1992." Leibrock then relates the history of treatments given to Lounnaphanh by his family physician, the studies made, and the symptoms of pain related by Lounnaphanh. Leibrock states the diagnostic studies "have demonstrated a left L5 radiculopathy on physiologic studies . . . . [T]here is a rather significant disc to the left side at the L1/2 . . . ." Leibrock describes the examinations and tests performed by him and others and then states that in his opinion this is a very difficult case and

> I do not know whether to recommend a surgical approach. . . . I think the best I could recommend would be to do a cervical MRI scan, a brain MRI scan, maker [sic] certain there is not something more central or more cortical that could be causing this total left hemicorpus problem and then there is always the question of this being a [workers'] comp type injury. I don't know what to make

of that, and it's very difficult for me to do that through the interpreter. I, therefore, would do the test[s] that I have recommended and then if nothing else is found . . . if I took out this disc on the left between L1/ and 2 it certainly may not resolve all of his problems.

Dr. Balachandran Wariyar's notes contain the following history dated December 12, 1992: "Lounnaphanh . . . on or about 11-16-92 while lifting a box, apparently hurt his lower back and since then has been bothered with pain in the left hip region, the back and down into the top of the left thigh." After a description of the examinations and tests performed, the notes state: "Clinical impression: 1) Left L3-4 radiculopathy symptomatic to a herniated disc." Wariyar's November 16, 1994, medical report contains the following medical history:

[O]n 11/16/92 after he had lifted a box, started to hurt in his lower back and following that, has had increasing problems in his left hip, back, and to the thigh. . . . [S]ubsequently saw Dr. O'Hara who did a laminectomy on February 14, 1994. . . . He's currently on Prednisone, Indocin, and Propoxyphene-N 100.

The report lists the examinations performed and then states: "CLINICAL IMPRESSION: 1. Failed back syndrome, status post lumbar laminectomy. 2. Cervical muscle strain with documented evidence of bulging disc at the lower cervical disc spaces. 3. The left hemianesthesia from the face down to the toe cannot be explained on anatomical basis."

In a letter to Hrnicek, dated March 30, 1995, Wariyar states, "In brief, [Lounnaphanh] sustained a work related injury to his lower back and, on February 14, 1994, he had a lumbar laminectomy done . . . ." Wariyar also states, "Clinically, we have a male who is a failed back syndrome with continuing left radicular pain . . . and evidence of a left carpal tunnel syndrome."

In a letter to Gordon Hauptman, a lawyer, O'Hara described Lounnaphanh's history, O'Hara's examination of Lounnaphanh, and the unsuccessful laminectomy performed on Lounnaphanh. O'Hara opined Lounnaphanh had reached maximum orthopedic benefit, that he had a 10-percent impairment of the lumbar spine, and that he was completely disabled from doing any work involving repetitive lifting, bending, or stooping. O'Hara then

stated he would anticipate the need for future intermittent medication and physical therapy, but that he could not opine with a reasonable degree of medical certainty the cost thereof.

O'Hara's file contained two "Doctor's Slips" signed by O'Hara, using the same form as used by Hrnicek and described above. Both forms are addressed to Monfort and are dated "Dec. 6 [1993]" and "7-29-94." Lounnaphanh is listed as the patient, the date of injury is listed as "11-16-92," and the problem is listed as "Re√Back[.] Herniated L2L3 lumbar disc[.] Degenerative lumbar disc L4L5" on one and "Re√Back" on the other. One form states the diagnosis as "[l]umber disc syndrome" and the other form states, "Degenerative lumbar disc disease." On both slips, the prepared boxes are marked to show the complaint is occupational rather than nonoccupational. The 1993 form states Lounnaphanh is unable to return to work for 14 days. The 1994 form states Lounnaphanh's injury is "permanent."

A report by O'Hara states, "The patient is a Laotian gentleman who injured his back while working for Monfort in 1992. Subsequent evaluation revealed the patient had a herniated disk at L1-2 on the left and also L5-S1 on the left side." The report also states that conservative treatment was unsuccessful and thus a laminectomy and disk excision at L1-2 and L5-S1 were performed.

On April 20, 1993, Salumbides, of the Mid-America Neurosurgery Clinic, P.C., reported his findings to Dr. William Suleiman. Salumbides' report is remarkable in that he relates a different history. Salumbides states Lounnaphanh says he had been having left lower lumbar pain since June 1992 and that Lounnaphanh attributes his condition to lifting boxes while at work, but that by November 1992 the pain had become progressively more severe. Salumbides describes the history he reviewed, his examination, and his "Impression." Salumbides states Lounnaphanh's symptoms seem to be arising from either the S1 or "the L5 root" and that the pattern of radiculopathy suggests these two levels rather than L1-2. Salumbides states he is not sure the L1-2 disk would need surgical decompression. Lounnaphanh decided against surgery. In July 1993, Salumbides stated he had nothing further to offer Lounnaphanh

except physical therapy and nonsteroidal anti-inflammatory medications.

*Extent of Disability.*

The second issue is the extent of Lounnaphanh's disability in view of his illiteracy, his pain, the possibility of his learning to speak and write English, and other factors relevant to his employability. Some of the following evidence is also relevant to the causation issue. We remind the reader that much of the above evidence is relevant to the extent of disability issue. We have classified the evidence according to the issue to which it has the most significance.

In an outpatient clinic note from Madonna Rehabilitation Hospital, dated September 14, 1995, Dr. David Diamant opined that many of Lounnaphanh's signs of nonorganicity indicated that there may be elements of symptom magnification; that Diamant had nothing left to offer Lounnaphanh; that Diamant's initial impairment rating of 10 percent was appropriate based upon radiculopathy; that Lounnaphanh could be employed; and that perhaps if Lounnaphanh could participate in a valid functional capacity assessment, then permanent work restrictions could be established, but that otherwise, any restrictions given would be subjective. In a letter dated September 27, Diamant opined that based on two previous functional capacity evaluations, Lounnaphanh should not be involved in jobs requiring crouching and kneeling; that he could occasionally climb stairs, bend, or squat, and occasionally carry up to 8½ pounds and frequently push up to 10 pounds; and that he can lift up to 10 pounds to chair or desk height and use his hands for simple and firm grasping as well as fine manipulation. On November 2, Diamant opined Lounnaphanh had reached maximal medical improvement.

The court received a report from Excel Rehabilitation, Inc., dated October 8, 1996, and addressed to defense counsel. The letter reports on an "Isostation B200" test that Randy Presler, a physical therapist, performed on Lounnaphanh on October 7. Presler reported that in taking part of the test, Lounnaphanh's lack of full effort produced "submaximal" findings and that the test results were inconclusive and inconsistent. Presler was also

called as a witness and testified that he was familiar with the B200, a computerized testing device to document the back and how it works. The machine somewhat resembles a backpack and is secured to the back, hips, thighs, and trunk of the patient and measures the patient's movements. Presler uses the machine in evaluating the patient's range of motion, movement, and strength. Presler performed the test on Lounnaphanh and described giving the test to Lounnaphanh and Lounnaphanh's actions during the test. Presler opined the results were inconsistent with Lounnaphanh's described condition and that Lounnaphanh was exaggerating his limitations.

Karen L. Stricklett, a rehabilitation consultant, also testified. Lounnaphanh was referred to her in October 1994 for vocational rehabilitation services, and she worked with him until April 1995. Stricklett enrolled Lounnaphanh in ESL classes and a physical conditioning program. Stricklett opined Lounnaphanh would be a candidate for vocational rehabilitation services. Stricklett was of the opinion that Lounnaphanh should have continued with ESL classes instead of quitting them. Stricklett stated she felt Lounnaphanh had the capacity to be a cashier, salesperson, desk clerk, night auditor, delivery person, or a limited-function security guard. She also stated her opinion regarding Lounnaphanh's decrease in loss of earning capacity if he attained one of these positions as opposed to being placed on total disability.

The court received exhibit 10, an exhaustive loss of earning capacity analysis by Stricklett & Associates, Inc., dated September 30, 1996. Stricklett concludes that based upon the opinions of O'Hara, Lounnaphanh would be employable but that, with a reasonable degree of vocational certainty, he would have sustained a loss of earning capacity of 20 percent. However, if consideration is given to Diamant's opinions, the loss of earning capacity would be 100 percent but not permanent, because Lounnaphanh would be able to return to work once he had improved his English skills. In an update, Stricklett's analysis is expanded to conclude that if Lounnaphanh successfully completed the advanced ESL course, he would be employable, but that his loss of earning capacity would be approximately 60 percent.

Both sides offered other evaluation letters and reports containing opinions by vocational experts on the extent of Lounnaphanh's injury from an economic point of view, his prospects for rehabilitation, and his loss of earning capacity.

In a letter dated September 30, 1994, Kurt McCallum, a registered physical therapist, reported on his examination and opined Lounnaphanh would benefit most from participation in pain management techniques. On March 27, 1997, McCallum updated his opinion and recommended Lounnaphanh be given instruction on proper lifting techniques, limits on the weight he could lift, a conditioning program, limits on activities which require a stooped or crouched position, and entry into a pain management program.

The court received a functional capacity evaluation dated May 15, 1996, from Lincoln Orthopedic Physical Therapy, P.C. The results indicated Lounnaphanh would be classified in the "[s]edentary" work category, but that the results of the evaluation may not be his maximum functional ability due to "a number of failed validity." The report is stated in terms of what Lounnaphanh can or cannot do and does not give a percentage capacity rating.

On June 14, 1996, Dr. Kip Burkman reviewed Lounnaphanh's history and apparently all of the reports of the other doctors, summarized them, examined Lounnaphanh, and stated his "Impression" as follows:

1. Status post hemilaminectomies at L1-L2 and L5-S1.

2. I feel the patient has nonorganic changes on physical exam that would represent a psychophysiologic reaction to the pain.

I feel the patient has 10% whole body permanent partial impairment based upon category III (radiculopathy) of the DRE lumbosacral category in the Fourth Edition of the AMA Guides To The Evaluation Of Permanent Impairment.

Burkman also stated that based upon the Lincoln Orthopedic Physical Therapy, P.C., evaluation, he felt Lounnaphanh would be able to work in at least the sedentary work category.

Vocational Assessment Services, Inc., did a loss of earning capacity study of Lounnaphanh. That report shows that a certified vocational rehabilitation counselor, who is also certified as

a vocational evaluator, studied all of the previous reports, did his own testing, and on September 25, 1996, opined with a reasonable degree of vocational certainty that Lounnaphanh had a 100-percent loss of earning capacity as a result of his work-related injury on November 16, 1992. In his summary, the evaluator bases his opinion that Lounnaphanh is unemployable on Lounnaphanh's unskilled work history, his lack of transferable skills, grade-school education, illiteracy in English, approaching advanced age, below average general intelligence, unrelenting severe pain, need for medication which makes him drowsy, need for a cane, and inability to sit and stand for more than 5 to 15 minutes.

On October 9, 1996, Midland Rehabilitation Consultants, Inc., made a vocational and earning capacity assessment report of Lounnaphanh. The assessor disclosed the reports reviewed, history taken, tests given, et cetera. This assessor agreed with the Stricklett opinion, but refused to give an opinion based on an assumption that Lounnaphanh would successfully complete the ESL program. The assessor argued that an opinion based on such an assumption would be speculative. The assessor also opined that a person that tested at the third grade level in mathematics would need to make a quantum leap to gain access to a job as a night auditor, a possible job listed in Stricklett's report.

## ASSIGNMENTS OF ERROR

Monfort alleges the trial court erred (1) in ruling that statements in Lounnaphanh's medical history constitute a legally proper and sufficient medical opinion of causation, (2) in ruling that doctor's slips with checkmarks indicating Lounnaphanh's condition was occupational constituted a legally proper and sufficient medical opinion of causation, (3) in ruling the evidence was sufficient to prove the accident caused Lounnaphanh's alleged inability to be competitively employed, (4) in ruling that Lounnaphanh was physically unable to attend ESL classes and therefore is unemployable, and (5) in finding Lounnaphanh to be totally and permanently disabled.

In sum, the legal issue in this appeal is whether the evidence supports the trial court's finding that the work-related accident Lounnaphanh testified he suffered on November 16, 1992, was

the cause of the disability the trial court found Lounnaphanh suffered. We conclude Monfort raised this issue in its first three assignments of error. The fourth and fifth assignments raise the issue of whether the evidence is sufficient to support the trial court's finding that Lounnaphanh is unemployable and totally and permanently disabled.

## STANDARD OF REVIEW

■ A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the judgment, order, or award; or (4) the findings of fact by the compensation court do not support the order or award. Neb. Rev. Stat. § 48-185 (Reissue 1993); *Starks v. Cornhusker Packing Co.*, 254 Neb. 30, 573 N.W.2d 757 (1998); *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996); *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996). In determining whether to affirm, modify, reverse, or set aside the judgment of the review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. See *Pearson v. Lincoln Telephone Co.*, 2 Neb. App. 703, 513 N.W.2d 361 (1994).

■ An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Berggren, supra.* Findings of fact made by a Workers' Compensation Court after review have the same force and effect as a jury verdict and will not be set aside unless clearly erroneous. *Kerkman, supra.*

## ANALYSIS

*Sufficiency of Evidence on Causation.*

■ Monfort argues that in a workers' compensation case the worker has the burden to prove the causal relationship between the injury, the employment, and the disability and that unless the injury is objective and plainly apparent, the worker must present legally competent medical testimony regarding that causal relationship. See, *Mendoza v. Omaha Meat Processors*,

225 Neb. 771, 408 N.W.2d 280 (1987); *Caradori v. Frontier Airlines*, 213 Neb. 513, 329 N.W.2d 865 (1983). No one disputes the validity of this proposition. Monfort goes on to argue that since the trial court stated it based its decision on the totality of the evidence, if one part of the totality is discredited, the totality is destroyed. We do not agree with this proposition. Obviously, the sufficiency of the evidence must be considered on the basis of all relevant evidence.

■ Monfort also argues that the medical history contained in the medical records does not establish causation and cites *Eubanks v. Drake Williams Steel*, 2 NCA 917 (1993) (not designated for permanent publication), and *Wilmart v. Cook Family Foods*, 96 NCA No. 9, case No. A-95-693 (not designated for permanent publication). We agree with this proposition, but we do not read the opinions of the trial judge or the review panel as assuming that the medical history found in the medical records establishes causation. We recognize that since doctors are rarely, if ever, present during an industrial accident, they must learn about the accident from others, generally their patients. We are of course concerned with whether the record contains medical opinions establishing that the events which the doctors learned of through medical history caused the medical condition with which the doctors diagnosed Lounnaphanh. The cited cases are not helpful, because they are both cases where the Workers' Compensation Court ruled that the evidence in the record was insufficient to prove causation. Therefore, in each of these cases, this court was considering whether the trial court was required to accept certain portions of the plaintiff's medical record as proof of causation. In this case, we are considering whether the trial court may accept certain evidence and the sufficiency of that evidence, if accepted.

*Miner v. Robertson Home Furnishing*, 236 Neb. 514, 462 N.W.2d 96 (1990) (*Miner I*), and *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 476 N.W.2d 854 (1991) (*Miner II*), give considerable guidance to the case at hand. The latter case is the second appearance of the same cause after a rehearing in the trial court. In *Miner II*, the plaintiff, who had suffered a previous noncompensable back injury as well as a work-related injury, introduced a doctor's medical file as the only evidence to

establish causation. The following note was the only evidence upon which the plaintiff could base causation:

> "[I]ncidentally, [Miner] tells me that the insurance company told him that the second accident when he was lifting a refrigerator was not the cause, but was related to the first accident and as I have told [Miner] there is a 10% recurrence after you have had a previous disc problem and certainly the timing of the lifting of the refrigerator and the pain that he developed afterwards, suggests that indeed the injury that he had when he lifted the refrigerator is what caused his recurrent disc problem."

239 Neb. at 532, 476 N.W.2d at 860. For that medical record to support a finding of causation, it would have been necessary that this office note be interpreted to mean that the doctor opined, with a reasonable degree of medical certainty, that the lifting of the refrigerator caused the disk problem. The Workers' Compensation Court held that as a matter of law, the note did not prove causation. In *Miner II,* the Nebraska Supreme Court compared the word "suggest" to the word "could," which word it had held in *Caradori, supra*, to be inadequate to convey an opinion of medical causation, and held in *Miner II* that the statement by itself was inadequate.

However, the *Miner II* court held that the "larger context," *id.* at 533, 476 N.W.2d at 860, of the doctor's note, including the reasons the doctor gave for disagreeing with the insurance company's position, did indicate the doctor's conclusion on the matter was given to a reasonable degree of medical certainty. The *Miner II* court, with two members dissenting, held the note was legally sufficient to establish causation and returned the cause to the Workers' Compensation Court to decide, in its capacity as a fact finder, whether the note proved the injury was caused by the work-related event.

*Miner II* rather clearly holds that a note in the doctor's record, alone, can, if otherwise sufficient, support a finding of causation. *Miner II* also recognizes that the meaning of the words in the medical record can be interpreted in their "larger context" and not read literally.

Hrnicek's records and Lounnaphanh's testimony establish that Lounnaphanh's back was in good condition before the

November 16, 1992, accident; that on that date, Lounnaphanh suffered an accident at work; that the accident was reported immediately and that by November 23, Lounnaphanh was seeking treatment for his back from Hrnicek; and that numerous medical examinations established Lounnaphanh's back was injured. The injured condition of Lounnaphanh's back, as opposed to the extent of the injury, is not disputed. Except for a slight inconsistency in Salumbides' record, there is no suggestion that Lounnaphanh injured his back other than while at work on November 16. In addition, the evidence contains several separate, consistent, but sometimes only partial opinions in which the doctors and therapists assume the medical history given by Lounnaphanh is correct and significant in their treatment of a serious medical condition. The probable meaning of the doctors' various statements must be judged in the "larger context."

For instance, the doctor's slips are forms obviously intended for the doctor to efficiently convey his opinion to the addressee, the patient's employer. The form dictates the information needed for an employer to efficiently learn the particular facts necessary to determine the employee's medical condition, its cause, whether the cause is work related, and what, if anything, the doctor thinks the employee may do in view of that condition. The form itself assures that the employer gets the necessary information. If one rewords one of the completed forms into a letter, it would read something like: January 18, 1993. To Monfort, Inc., Grand Island: On this date at 3:50 p.m., I saw Bounmy Lounnaphanh, Soc. Sec. No. 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, in regard to his injury of 11/16/92. He complained about his back. I diagnosed his condition to be chronic back strain and tuberculosis. The former is occupational, and the latter is nonoccupational. I have determined he is able to resume his duties, but he is restricted from heavy lifting. Signed, Dr. Hrnicek (by initials only). This doctor's slip would establish that the back problems of January 18, 1993, were caused by an occupational injury of November 16, 1992. The records establish similar causes and diagnoses for identical back problems on different days.

In viewing these records, it must be remembered the doctors are not likely to express their opinions to their own files or to another doctor in the "legalese" expression "to a reasonable

degree of medical certainty." Generally, they state a positive opinion which does not conform to the language used when rendering an opinion in court.

When Leibrock writes to Salumbides, "My impression was that he injured his back while lifting a box in November 1992," he is not likely to be repeating medical history. Leibrock is writing to the doctor that sent Lounnaphanh to him and obviously would have known the medical history Lounnaphanh regularly related to his doctors. It appears as though Leibrock, a specialist in neurological surgery, was rendering an opinion to the doctor who had referred Lounnaphanh to him, as part of a comprehensive report to a doctor that had chosen to consult with him.

Furthermore, the record contains such evidence as Wariyar's report stating his impression of "[f]ailed back syndrome, status post lumbar laminectomy" and a letter written by O'Hara, the surgeon who performed the surgery, describing an unsuccessful hemilaminectomy. In fact, a study of the various doctors' records shows that Diamant and Wariyar and Drs. T.R. Rusthoven, G.D. Janulewicz, and Joel Elson used the word "impression" as a heading in one of the various sections of their reports, and each of them placed in that section what is usually called a diagnosis. These doctors clearly used the word "impression" to mean "my diagnosis at this time is . . . ."

After studying the records, it is clear that no doctor questioned the fact that Lounnaphanh's back was injured in the manner Lounnaphanh claims. The fact that his back was injured was objectively established by x ray and other tests which give the doctors objective results. A serious operation was performed to alleviate the known condition of Lounnaphanh's back. Although it appears that some of the experts question whether Lounnaphanh's back continues to hurt as bad as he says it does or as he would like people to believe, the evidence contains no suggestion of any cause of Lounnaphanh's condition other than the November 16, 1992, incident. It is easy to understand why the trial judge found for Lounnaphanh on the issue of causation, and we cannot say the judge was wrong.

*Extent of Disability.*

Monfort next argues the trial judge erred in finding Lounnaphanh is unable to attend ESL classes and is, therefore,

unemployable. The evidence on the earning capacity of Lounnaphanh is contradictory. We have summarized it above and will not attempt any further summary. Monfort argues the trial judge erroneously found Lounnaphanh was unable to attend ESL courses. Under our standard of review, the only basis for Monfort to maintain that the trial judge erred in that respect is to argue Lounnaphanh can attend such classes. Monfort argues this point on the basis that the only premise for that finding was Hrnicek's opinion dated April 1, 1995, that Lounnaphanh was unable to attend ESL classes until further notice because of pain. There are more recent opinions that disagree with Hrnicek, and therefore, Monfort argues his opinion should be disregarded. Lounnaphanh testified that the pain has not decreased. If the trial judge chose to believe Lounnaphanh, Hrnicek's opinion is clearly not stale. The Workers' Compensation Court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996); *Toombs v. Driver Mgmt., Inc.*, 248 Neb. 1016, 540 N.W.2d 592 (1995). The compensation court may determine which, if any, of the expert witnesses to believe. *Surratt v. Watts Trucking*, 249 Neb. 35, 541 N.W.2d 41 (1995). When the record in a workers' compensation case presents conflicting expert testimony, the appellate court will not substitute its judgment for that of the compensation court. See, *Kerkman, supra*; *Paulsen v. State*, 249 Neb. 112, 541 N.W.2d 636 (1996). We cannot say the trial court is clearly wrong in its determination. We therefore affirm the order of the review panel affirming the order of the trial judge.

AFFIRMED.