IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

PETERSON V. LEPRINO FOODS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KATHY PETERSON, APPELLEE,

V.

LEPRINO FOODS AND ITS INSURERS, AMERICAN ZURICH INSURANCE CO. AND
HARTFORD INSURANCE COMPANY OF THE MIDWEST, APPELLANTS.

Filed September 29, 2015.    No. A-14-1167.

Appeal from the Workers' Compensation Court: MICHAEL K. HIGH, Judge. Affirmed.

Melvin C. Hansen, of Hansen, Lautenbaugh & Buckley, L.L.P., for appellants.

William J. Erickson for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Leprino Foods and its workers' compensation insurers appeal from the Workers' Compensation Court's award of benefits to Kathy Peterson. On appeal, they challenge the court's findings that Peterson suffered an aggravation injury in April 2013 and that no reasonable controversy existed concerning that injury. For the reasons that follow, we affirm.

### BACKGROUND

*Peterson's Employment at Leprino Foods.*

Peterson began working in the Leprino Foods cheese factory in January 2009. While employed by Leprino foods, Peterson performed various jobs, including working on a variety of machines. During Peterson's employment, she suffered accidents and injuries to her lower back in

June 2010, September 2012, and April 2013. Peterson has not worked since April 19, 2013, the date of her third accident.

*June 2010 Accident and Injury.*

On June 29, 2010, Peterson was cleaning the dry mixer at work when her glove caught on something and she was pulled forward into the machine up to her hips. When Peterson extracted herself, she felt a sensation in her back that became progressively worse. Peterson notified her supervisor and initially sought treatment at First Care Medical of Ravenna. Peterson continued to work for Leprino Foods while she was receiving treatment for her injury from the first accident.

On June 29, 2010, Peterson was examined at First Care by a physician's assistant (PA) whose impression was of "a mechanical flareup of [Peterson's] back" with "mild radicular symptoms." The PA prescribed pain medication and provided lifting and movement restrictions. An MRI of her spine taken on July 15 showed mild disk disease at L3-L4 through L5-S1 as well as a small superimposed annular tear at L4-L5.

The PA who saw Peterson at First Care referred her to Dr. James Mahalek, an orthopedic surgeon. Mahalek first examined Peterson on September 2, 2010. At that time, Peterson continued to have low back, left buttock, and posterior thigh pain; numbness and tingling in her left hip and thigh; as well as bilateral leg numbness and tingling with sleeping. Mahalek's impression was of lumber degenerative disk disease, lumbar strain, and low back pain. Mahalek felt that Peterson was symptomatic from a soft tissue injury, and he expected her to improve within 3 months of her injury. He recommended a neurology evaluation with EMG nerve conduction studies of her lower extremities. Mahalek also recommended physical therapy and that Peterson remain on light duty.

Peterson continued to treat with Mahalek in October and November 2010 for her low back pain and tenderness over the left sacroiliac (SI) joint. Mahalek's impression after further examination of Peterson was of low back pain and SI joint dysfunction. On November 12, Mahalek administered an SI joint steroid injection. According to Peterson, her condition improved after this injection and she was essentially symptom free for 1½ years. On January 18, 2011, Mahalek placed Peterson at maximum medical improvement (MMI) and released her to work without restrictions.

*September 2012 Accident and Injury.*

During the late summer and fall of 2012, Peterson was working on the dry mixer, which job required her to carry 50-pound bags of salt at various points during her shift. Sometime during the first two weeks of September, Peterson's ability to walk and carry those bags became very limited "[b]ecause the pain in [her] back was getting excruciating." Peterson told her supervisor and moved to a different machine that did not require her to carry bags of salt. A few days after she stopped carrying bags of salt, Peterson woke up at home with significant back pain and was "unable to move [her] legs to get out of bed to go to work." Peterson notified Leprino Foods and took the day off work, but she did not seek medical attention until September 12 when she visited First Care Medical, P.C. in Kearney, Nebraska. Peterson continued to work at Leprino Foods while treating her injury from the second accident. Peterson's back continued to hurt during the period between the September 2012 and April 2013 accidents and injuries.

On September 12, 2012, when Peterson initially sought treatment at First Care for the second accident and injury, she reported chronic low back pain that started 4 months prior but was "worse since yesterday." She did not report any recent "fall or injury." The doctor at First Care referred her to Mahalek.

On September 24, 2012, when Peterson was evaluated by Mahalek and his PA, Peterson's chief complaint was low back pain with bilateral leg pain and numbness. Peterson reported that she was asymptomatic following resolution of symptoms from her June 2010 accident until 3-4 months prior to her visit. She also reported that she began to experience increased soreness in her back between September 2 and September 8 when she was lifting 50 pound bags of salt at work. Mahalek and his PA felt that Peterson was "symptomatic from a work injury that occurred between September 2 and September 8." They concluded that Peterson was symptomatic from a new injury because she had previously become asymptomatic from the June 2010 injury. They prescribed pain medication and physical therapy and recommended SI joint injections.

Following the second accident, Peterson also treated with Dr. Shaleah Jones, her primary care physician, for her injury. Peterson saw Jones on October 18, 2012, and Jones' assessment was of nonspecific low back pain and SI joint dysfunction. Jones recommended either proceeding with an SI joint injection or an MRI, and after discussion with Peterson, decided on the MRI. Jones also prescribed pain medication and gave work restrictions. On October 22, Jones wrote to Peterson and stated that her recent MRI was within normal limits and that Jones could find no anatomical reason to explain Peterson's symptoms of numbness and lower extremity pain. Jones referred Peterson to Dr. Chris Wilkinson, a general orthopedist.

Wilkinson first saw Peterson on October 22, 2012. In his office notes from the visit, Wilkinson stated that Peterson "has no signs of back problems, but she does not have any of Waddell's signs of low back pain not associated with physiologic cause either." Wilkinson informed Peterson that her history of numbness and tingling was unusual in that it did not follow any specific neurologic pattern. Wilkinson observed that Peterson had some tenderness over her coccyx but that this would not cause any of the accompanying symptoms that were troubling her. Wilkinson recommended a neurologic consult. Peterson returned for a follow-up visit on November 8. A steroid injection over the coccyx at that time did not provide Peterson with significant pain relief. In December 2012, Peterson reported that her back pain was improving with physical therapy. Wilkinson continued Peterson in physical therapy and approved her to work an 8-hour day with lifting up to 30 pounds occasionally. Peterson saw Wilkinson with continued complaints of back pain and leg numbness on January 17, 2013. Wilkinson discontinued Peterson's physical therapy as it was no longer providing her relief. He also performed a trigger point injection which did provide significant but not complete pain relief. On February 28, Wilkinson gave Peterson a permanent 30-pound lifting restriction, encouraged her to continue her low back exercises indefinitely, and discharged Peterson from the clinic.

On January 27, 2013, Jones wrote a letter to Peterson in response to her questions about "the initial cause of her current back pain." Jones opined that Peterson's current back pain "is not likely related to [her] injury from 2 years ago as [Peterson] had reported being essentially symptom free" for approximately 1½ years after the SI joint injection performed by Mahalek. Jones also

stated her belief that Peterson's current symptoms "started after some particularly strenuous activities at work in September of 2012."

*April 2013 Accident and Injury.*

Peterson's third accident and injury occurred when she was working on the palletizer, which is a machine that places boxes of cheese onto pallets. Once that process is complete, the machine operator uses a forklift to move the pallets into the freezer. Sometimes during this process, boxes fall off of the pallets, and the operator has to carry them up the stairs to place them back onto the pallet. On April 19, 2013, Peterson was carrying a box up a flight of stairs when she had a sudden increase in back pain in the same place in her back as the pain she experienced in September 2012. According to Peterson, the level of pain she felt eventually decreased and returned to the same level as prior to the April 2013 accident. Peterson has not worked since April 2013.

On April 19, 2013, Peterson was taken to the emergency room by private car. She had to be carried out of the car. A CT of her lumbar spine showed "very little abnormality" and "possibly some minimal left disk herniation at L3 but no spinal stenosis." The emergency room doctor's impression was of low back pain secondary to muscle spasm and minimal "L4 disk herniation."

On April 23, 2013, Peterson saw Dr. Loren Jacobsen, another doctor at the clinic where Jones worked. Peterson reported to Jacobsen that she experienced the onset of severe back pain at work on April 19 when she was carrying a box of cheese up the stairs. Jacobsen examined Petersen and reviewed the CT scan taken on April 19. He assessed Peterson with musculoligamentous low back pain, possible mild depression, and a disk bulge to the left at L4-5 per the CT scan.

On April 25, 2013, Peterson saw Wilkinson for her "new episode of back pain." Wilkinson noted the history given by Peterson of sudden pain in her low back while carrying a box up the stairs at work followed by her trip to the emergency room. Wilkinson examined Peterson and reviewed the CT taken on April 19. His impression was of left low back pain with radiation. Wilkinson was not certain if the April 19 CT showed a "worsening lesion at L4-5 compared to the [July 2010] MRI report." Peterson returned to Wilkinson on July 18, at which time Wilkinson's impression was that Peterson "appear[ed] to have chronic low back without radiation." Wilkinson then referred Peterson to Dr. Kenneth Pettine, an orthopedic doctor in Colorado.

On September 17, 2013, Pettine performed a lumbar discography on Peterson at L4-5 and L5-S1 to "attempt to diagnose normal and abnormal discs prior to consideration of additional treatment." Peterson's discography report indicated that she had "abnormalities and concordant pain at the L4-5 level." Pettine recommended surgery and discussed "fusion and non-fusion technology" surgical options with Peterson.

In January 2014, Peterson began treating with Dr. Burt McKeag for pain management. McKeag administered facet injections to Peterson's lumbar spine. At trial, Peterson testified that the injections did help.

*Independent Medical Examinations.*

On July 4, 2013, Dr. David Benavides, a spinal surgeon, submitted his written Independent Medical Examination report. Benavides only reviewed Peterson's medical records and did not

examine Peterson. Benavides found that Peterson recovered from her June 2010 injury and that her September 2012 complaints were unrelated to her work with Leprino Foods. With respect to Peterson's September 2012 accident and injury, Benavides specifically stated:

> Interestingly enough, [Peterson] reported an injury that occurred on September 10, 2012 after lifting bags per the First Report of Alleged Occupational Injury. Her presentation to First Care on September 12, 2012 reveals a four month history of low back pain being asymptomatic prior to that from her previous injury of 2010. She also reported a three month history by records when she presented to [physical therapy] on November 1, 2012. The information creates a significant question on the validity of the overall complaints for [Peterson] with respect to timing and actual etiology.

Benavides opined that Peterson's September 2012 injury "has some other cause not related to her work." He also noted that Peterson was at risk for progression of degenerative changes of the lumbar spine as a result of aging as well as nicotine use. Benavides recommended that Peterson continue with a home exercise program and use of anti-inflammatory medication as tolerated. Finally, Benavides reviewed the records relating to Peterson's April 2013 injury. Benavides stated, "As to whether the changes/symptoms [shown in April 2013] are due to a new injury or an exacerbation/flare-up of a preexisting condition is difficult to address at this time. [Peterson] would be in need of an MRI to distinguish chronic changes versus an acute disk injury."

On July 5, 2013, Dr. Michael O'Neil provided an Independent Medical Examination report, following an examination of Peterson and a review of her medical records. O'Neil opined that it was "more probable than not" that Peterson sustained a work-related injury in June 2010. O'Neil concluded that Peterson recovered completely from this accident and injury following the SI joint injection administered by Mahalek and that no disability or impairment resulted from the June 2010 injury. In his original report, O'Neil found that Peterson suffered a work-related injury in September 2012 "when she was installing a safety shield on a tank at Leprino." He also opined that Peterson sustained "an exacerbation or temporary worsening of a preexisting and symptomatic condition as a result of carrying 28-pound boxes up a flight of stairs on April 19, 2013." Based on his opinion that the April 2013 incident resulted in "an exacerbation or a temporary flare-up of her preexisting symptomatic back condition," O'Neil did not believe that Peterson was entitled to any disability as a result of the April 2013 incident.

After being provided with additional medical records and Peterson's deposition testimony, O'Neil submitted an additional report, concluding that Peterson did not suffer a work-related injury in September 2012. O'Neil stated:

> First of all, when [Peterson] consulted [Mahalek] on September 24, 2012, she advised him that she had been experiencing low back pain and bilateral leg pain and numbness for three to four months prior to this clinic visit. She also claimed that her back pain became worse while she was lifting 50-pound bags of salt over a period of a week from September 2, through September 8, 2012. In her deposition, she was asked what happened on September 10, 2012, and was there a specific incident that happened while she was at work and she responded that she was unable to move when she woke up in the morning and this problem happened prior to her going to work. When she was asked if the

pain was the same pain that she was experiencing in June of 2010, she responded that the pain was in the same location. This is not what [Peterson] told me at the time of my examination on June 20, 2013.

Following my review of these additional records as well as the report from [Benavides] dated July 4, 2013, I am in complete agreement with [Benavides] that [Peterson] did not sustain a work-related injury on September 10, 2012. Therefore, my response . . . would be, "no", [Peterson] did not sustain a work-related injury on September 10, 2012. Also, my response . . . is that [Peterson] did not sustain an exacerbation or a flare-up of a preexisting condition on September 10, 2012. In her deposition, she testified that her back pain and leg pain was present when she woke up on the morning of September 10, 2012, and was not related to her work activities at Leprino.

*Pleadings*.

On October 15, 2012, Peterson filed a petition in the compensation court, seeking an award of benefits in connection with the June 2010 accident and injury. She subsequently filed an amended petition, adding allegations about the September 2012 and April 2013 accidents and injuries and seeking an award of benefits in connection with all three incidents.

*Trial*.

Trial was held before the compensation court on May 9, 2014. The court received various exhibits, including Peterson's medical records and depositions into evidence, and heard testimony from Peterson. The evidence has already been set forth above.

*Award*.

On November 21, 2014, the compensation court entered an award of benefits to Peterson. The court found that Peterson suffered injury to her lower back as a result of each of the three accidents described in her operative petition. The court determined that the injury Peterson suffered in the June 2010 accident resolved completely without permanent disability after an SI joint injection by Mahalek. The court determined that the September 2012 injury was a cumulative trauma injury with an accident date of September 12, 2012, which was the date Peterson left work and sought medical treatment. The court awarded no temporary or permanent indemnity benefits as a result of injuries sustained in the first two accidents as Peterson continued to work and receive her regular wages from Leprino Foods until she was injured in the April 2013 accident. The court observed that Peterson suffered no permanent impairment from the first accident and did not reach MMI from the second accident before suffering the third accident.

As to the April 2013 accident, the compensation court found that Peterson suffered an aggravation injury on April 19 and had not returned to work since that date. The court found that Peterson was entitled to temporary total disability from April 19 through the trial date and continuing until she reached MMI. Because Peterson had not yet reached MMI for the injuries she suffered in the April 2013 accident, the court did not decide the issue of her loss of earning power for any permanent disability or her entitlement to vocational rehabilitation. The court found that

Leprino Foods owed certain specified outstanding medical expenses and that Peterson was entitled to future reasonable and necessary medical care for her low back injury. The court also found:

> In this case, there is no reasonable controversy concerning the aggravation injury resulting in temporary total disability caused by the accident of April 19, 2013. [Leprino Foods'] own expert [O'Neil] established causation of the aggravation injury and as a result [Peterson] is entitled to a 50 percent waiting time penalty of $13,267.93. [Peterson is also entitled to the statutory interest rate on any benefits due and owing for longer than 30 days past their accrual date and a reasonable attorney fee which this Court finds to be $3,500.00 for preparing and bringing this issue to trial.

On November 26, 2014, the compensation court modified the award to include a finding that Leprino Foods should pay for specified mileage expenses incurred as Peterson sought reasonable and necessary medical care.

## ASSIGNMENTS OF ERROR

Leprino Foods asserts that the compensation court erred in (1) finding that Peterson suffered an aggravation injury on April 19, 2013 and (2) concluding that no reasonable controversy existed concerning the nature of the alleged April 19 injury.

## STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Gardner v. International Paper Destruction & Recycling*, 291 Neb. 415, 865 N.W.2d 371 (2015). On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.* In workers' compensation cases, an appellate court determines questions of law. *Id.*

## ANALYSIS

*April 2013 Injury.*

Leprino Foods' first assignment of error is that the compensation court erred in finding that Peterson suffered an aggravation injury on April 19, 2013. However, Leprino only argues its second assignment of error. Errors that are assigned but not argued will not be addressed by an appellate court. *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014). Accordingly, we do not address this assignment of error further.

*Reasonable Controversy.*

Leprino Foods asserts that the compensation court erred in concluding that no reasonable controversy existed concerning the nature of the alleged April 19, 2013 injury.

Neb. Rev. Stat. § 48-125 (Cum. Supp. 2014) requires an employer to pay the 50-percent waiting-time penalty in the following circumstances: if (1) the employer fails to pay compensation within 30 days of the employee's notice of a disability and (2) no reasonable controversy existed regarding the employee's claim for benefits. *Manchester v. Drivers Mgmt.*, 278 Neb. 776, 775 N.W.2d 179 (2009). A reasonable controversy may exist (1) if there is a question of law previously unanswered by the appellate courts, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the Nebraska Workers' Compensation Court concerning an aspect of an employee's claim for workers' compensation, which conclusions affect allowance or rejection of an employee's claim, in whole or in part. *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987); *Manchester v. Drivers Mgmt, supra.* Whether a reasonable controversy exists under § 48-125 is a question of fact. *Id.* To avoid the penalty provided for in § 48-125, an employer need not prevail in the employee's claim--it simply must have an actual basis in law or fact for disputing the claim and refusing compensation. *Stacy v. Great Lakes Agri Marketing, Inc.*, 276 Neb. 236, 753 N.W.2d 785 (2008). Under the *Mendoza* test, when there is some conflict in the medical testimony adduced at trial, reasonable but opposite conclusions could be reached by the compensation court. See, *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015).

Although the only question we are called upon to answer is whether there was a reasonable controversy concerning causation of Peterson's April 2013 injury, the interplay of the two previous injuries is an integral part of the discussion. There was no dispute that the June 2010 injury was caused by a work-related injury and that Peterson's symptoms had completely resolved before the events of September 2012. There was a dispute in the evidence as to whether the September 2012 injury was work-related, which dispute the compensation court resolved in Peterson's favor. Leprino Foods does not assign error to this finding.

Turning to the third injury in April 2013, the compensation court determined that this "aggravation injury" to Peterson's low back was caused by carrying boxes of cheese up a stairway at work. Leprino Foods failed to argue this assigned error in its brief, and we therefore do not address it. The court further found that there was no reasonable controversy concerning the "aggravation injury" caused by the April 2013 accident, stating that Leprino Foods "own expert [presumably referring to O'Neil] established causation of the aggravation injury".

Leprino Foods disagrees with the compensation court's characterization of O'Neil's opinion. Leprino Foods relies on the opinions of Benavides and O'Neil (the second opinion), which found that Peterson's September 2012 injury was not work-related and was merely a progression of Peterson's preexisting degenerative disk disease. Leprino Foods then argues that the symptoms Peterson experienced as a result of the incident in April 2013 were a "recurrence" of the September 2012 injury (and not an "aggravation") and that this position is supported by O'Neil's opinion. Leprino Foods notes the terminology used by O'Neil in his opinion as to the April 2013 injury. Specifically, Leprino Foods notes O'Neil's statements that Peterson sustained "an exacerbation or temporary worsening of a preexisting and symptomatic condition as a result of carrying 28-pound boxes up a flight of stairs on April 19, 2013" and that the April 2013 incident "resulted in an exacerbation or a temporary flare-up of her preexisting symptomatic back

condition." Leprino Foods concedes that if O'Neil had only stated that Peterson suffered an exacerbation, there would not be a reasonable controversy, but argues that since O'Neil also used the words "temporary" and "flare-up," his opinion became far less clear.

The distinction between an aggravation and a recurrence of a previous injury is typically discussed in cases involving multiple accidents and multiple insurers in which we are required to determine which insurer must pay for the second injury. Thus, a review of case law in that area will be useful to our analysis of whether there is a reasonable controversy as to the nature of Peterson's April 2013 injury. When a subsequent injury aggravates a prior injury, the insurer at risk at the time of the subsequent injury is liable. *Miller v. Meister & Segrist*, 255 Neb. 805, 587 N.W.2d 399 (1998); *Miller v. Commercial Contractors Equip.*, 14 Neb. App. 606, 711 N.W.2d 893 (2006). But, if the subsequent injury is a recurrence of the prior injury, the insurer at risk at the time of the prior injury is liable. *Id.* Where there have been two accidents to an employee, the question of whether the disability sustained by him should be attributed to the first accident or to the second accident depends on whether or not the disability sustained was caused by a recurrence of the original injury or by an independent intervening cause. *Mendoza v. Omaha Meat Processors*, *supra*. If the second injury is but a recurrence of the original injury, compensation therefor must be paid by the employer and insurance carrier at the time of the first injury. *Id.* In *Mendoza*, the Nebraska Supreme Court, quoting 4 Arthur Larson, The Law of Workmen's Compensation §§ 95.22 and 95.23 (1987), stated:

There is . . . a fine line separating aggravations from recurrences. . . .

In order to find that there has been an aggravation, it must be shown that the second episode contributed independently to the final disability. Also, there must have been a second 'injury' as that term is used in the jurisdiction. . . .

If the second injury takes the form merely of a recurrence of the first, and if the second incident does not contribute even slightly to the causation of the disabling condition, the insurer on the risk at the time of the original injury remains liable for the second. . . . This group . . . includes the kind of case in which a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.

225 Neb. at 782, 408 N.W.2d at 287.

A review of case law involving the interplay between preexisting conditions and work-related injuries is also useful to our analysis. In a workers' compensation case involving a preexisting condition, the claimant must prove by a preponderance of evidence that the claimed injury or disability was caused by the claimant's employment and is not merely the progression of a condition present before the employment-related incident alleged as the cause of the disability. *Damme v. Pike Enterprises, Inc.*, 289 Neb. 620, 856 N.W.2d 422 (2014). A workers' compensation claimant can recover benefits when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce disability, even if no disability would have occurred absent the preexisting condition. *Id.* The "lighting up" or acceleration of a preexisting condition by an accident is a compensable injury. *Id.* A preexisting disease and an aggravation of

that disease may combine to produce a compensable injury. *Manchester v. Drivers Management, LLC*, 278 Neb. 776, 775 N.W.2d 179 (2009).

In *Damme v. Pike Enterprises, supra*, the employer argued that the accident in question did not result in a work-related injury but was a "temporary symptom aggravation" of the worker's preexisting back problem. The Nebraska Supreme Court disagreed, finding that two doctors (one of whom is also Michael O'Neil) both concluded that the worker had sustained an exacerbation of her preexisting degenerative disk disease. In his initial report, O'Neil indicated that he could not separate what portion of the worker's current back pain was the result of the work injury from the natural progression of the disease. O'Neil later revised his opinion, reaffirming that the worker sustained an "exacerbation or a temporary worsening of" her preexisting disk disease, but finding that it was more probable than not that her preexisting conditions had caused her pain and not the "minor" incident at work. In resolving the conflict between O'Neil's two opinions in favor of the worker, the Supreme Court noted that resolving conflicts within a health care provider's opinion also rests with the court, as the trier of fact. *Id.; Swanson v. Park Place Automotive*, 267 Neb. 133, 672 N.W.2d 405 (2003).

In resolving this appeal, we are not called upon to determine whether the compensation court erred in its determination of causation with regard to any of the three accidents. Rather, we must determine whether the compensation court clearly erred in finding that there was no reasonable controversy concerning the cause of the April 2013 injury. In other words, we examine the record to determine whether there was some conflict in the medical evidence adduced at trial concerning causation of the April 2013 injury such that reasonable but opposite conclusions could be reached by the compensation court. See, *Armstrong v. State, supra*.

The compensation court cites to records from O'Neil, Jacobsen, and Wilkinson in support of its causation conclusion regarding the April 2013 injury. In the records cited by the compensation court, Jacobsen and Wilkinson both noted the history given by Peterson of the sudden onset of increased pain when she was carrying a box up the stairs at work on April 19, 2013. This court recognized in *Lounnaphanh v. Monfort*, Inc., 7 Neb. App. 452, 583 N.W.2d 783 (1998), however, while it is acceptable for a doctor to learn about a worker's accident and medical history from the worker directly, the medical history contained in the medical records alone does not establish causation. As discussed above, O'Neil opined that Peterson sustained "an exacerbation or temporary worsening of a preexisting and symptomatic condition" on April 19. The records relied upon by the compensation court do not indicate that these doctors ever questioned Peterson's account of the April 2013 accident which occurred at work or the pain Peterson attributed thereto.

We conclude that the compensation court did not clearly err in finding that there was no reasonable controversy with regard to causation of the April 2013 injury. There is no dispute in the record that Peterson sustained an injury while carrying boxes of cheese up a stairway in the course and scope of her employment at Leprino Foods. O'Neil concluded that Peterson sustained an exacerbation or temporary worsening of a preexisting condition. Although O'Neil changed his opinion as to the nature of the preexisting condition between his two reports, he did not alter his opinion that the April 2013 injury was an exacerbation or temporary worsening of the preexisting condition. Whether the preexisting condition was the result of the 2012 work-related injury or a

preexisting back problem, the result is the same--the April 2013 injury was caused by Peterson's employment. O'Neil's use of the "temporary worsening" language with respect to the 2013 injury does not create a reasonable controversy regarding causation of this injury. See, *Damme v. Pike Enterprises, supra*. There was no dispute in the medical evidence concerning the causation of the April 2013 injury and we therefore affirm the finding of no reasonable controversy by the compensation court.

## CONCLUSION

The compensation court did not err in finding that no reasonable controversy existed with respect to the causation of the 2013 injury and in awarding Peterson a waiting time penalty, interest, and a reasonable attorney fee.

AFFIRMED.