SOUTHEAST RURAL VOLUNTEER FIRE DEPARTMENT, A NEBRASKA NONPROFIT CORPORATION, ET AL., APPELLANTS, v. NEBRASKA DEPARTMENT OF REVENUE, CHARITABLE GAMING DIVISION, AND M. BERRI BALKA, NEBRASKA STATE TAX COMMISSIONER, APPELLEES.

560 N.W.2d 436

Filed February 28, 1997.    No. S-95-431.

Barry L. Hemmerling, of Jeffrey, Hahn, Hemmerling & Zimmerman, P.C., for appellants.

Don Stenberg, Attorney General, and L. Jay Bartel for appellees.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and BUCKLEY, D.J.

CAPORALE, J.

## I. STATEMENT OF CASE

These consolidated appeals arise under the provisions of the Administrative Procedure Act, Neb. Rev. Stat. §§ 84-901 through 84-920 (Reissue 1994 & Cum. Supp. 1996), the Nebraska Bingo Act, Neb. Rev. Stat. §§ 9-201 through 9-266 (Reissue 1991 & Cum. Supp. 1996), and the Nebraska Pickle Card Lottery Act, Neb. Rev. Stat. §§ 9-301 through 9-356 (Reissue 1991 & Cum. Supp. 1996). In the first appeal, enrolled at docket 505, page 241, in the records of the district court, and styled therein as "Southeast Rural Volunteer Fire Department, a Nebraska non-profit Corporation; Joseph Booth, Utilization of Funds Member; Ronald E. Olson, Gaming Manager, Plaintiffs, v. Nebraska Department of Revenue, Charitable Gaming Division, and M. Berri Balka, Nebraska State Tax Commissioner, Defendants," the appellee department, after an evidential hearing, denied, for the license period 1992-93, the applications of the appellant Southeast Volunteer for the renewal of a charitable gaming license, of the appellant Booth for a utilization of funds member's license, and of appellant Olson for a gaming manager's license. In the second appeal, enrolled at docket 514, page 230, in the records of the district court, and styled therein as "Southeast Rural Volunteer Fire Department, a volunteer fire department; Joseph Booth, Utilization of Funds Member; Ronald E. Olson, Gaming Manager, Plaintiffs, v. Nebraska Department of Revenue, Charitable Gaming Division, and M. Berri Balka, Nebraska

State Tax Commissioner, Defendants," the appellee department, by summary judgment, denied, for the license period 1993-94, the applications of the appellants Southeast Volunteer, Booth, and Olson for the renewal of like licenses. The district court affirmed the decision of the department in each of the cases, and the applicants-appellants appealed to the Nebraska Court of Appeals, asserting, in summary, that the district court erred in (1) failing to find, with respect to the first appeal, that the department's rulings were erroneous and (2) ruling, with respect to the second appeal, that summary judgment was an appropriate remedy. We, on our own motion, under our authority to regulate the caseloads of the Court of Appeals and this court, removed the matter to our docket. We now affirm the judgment of the district court in the first appeal and reverse its judgment with respect to the second appeal, and remand that matter with direction.

## II. SCOPE OF REVIEW

There being no substantial dispute with respect to the facts, these appeals involve the interpretation of statutes and regulations, which presents questions of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below, according deference to an agency's interpretation of its own regulations, unless plainly erroneous or inconsistent. See *Inner Harbour Hospitals v. State, ante* p. 793, 559 N.W.2d 487 (1997).

## III. FACTS

Southeast Volunteer provided personnel to Southeast Rural Fire Protection District, which was organized pursuant to statute for the purpose of providing fire protection to certain residents of Lancaster County, Nebraska. Southeast Volunteer also assisted Southeast District by raising money as the result of conducting bingo games and selling pickle cards. Southeast Volunteer held licenses to conduct bingo games and a lottery by the sale of pickle cards for the period from October 1, 1989, through September 30, 1990. It sold pickle cards at the location at which it conducted its bingo games in Lincoln and also mar-

keted pickle cards through licensed pickle card operators in the state. Although the bingo games did not produce a profit, the revenue derived from the sale of pickle cards during the games did. These activities provided the major source of Southeast Volunteer's revenue. That revenue was placed first in either the bingo bank account, the pickle card bank account for pickle cards sold at the bingo game, or the pickle card bank account for pickle cards sold to pickle card operators. The revenue was then transferred to Southeast Volunteer's general bank account, from which it was used to make expenditures on behalf of Southeast Volunteer or Southeast District.

Southeast District's board of directors, consisting of five publicly elected members, had oversight authority over Southeast Volunteer. Four of these board members, including Olson and Booth, were firefighters with Southeast Volunteer and had been such for periods ranging from approximately 18 to more than 20 years. Olson was president and Booth was secretary-treasurer of Southeast District during the time Southeast Volunteer held its gaming licenses, and its gaming activities were managed by Olson, who was licensed as a gaming manager, and by Booth, who was licensed as a utilization of funds member.

Southeast District and Southeast Volunteer decided that in order to encourage firefighters to remain with Southeast Volunteer and develop a pool of competent and experienced firefighters, Southeast District would institute a retirement plan for the firefighters. The plan became effective July 1, 1990, and provided that firefighters with at least 5 years of service could draw their share of the account to use upon retirement (at 59½ years of age) or upon becoming disabled, and that their families could draw the firefighter's share upon the firefighter's death. Those drawing money under the plan could take their share in installments, a lump sum, or a combination of their choice. The firefighters participating in the plan could choose how their portion would be invested. Southeast Volunteer funded the plan retroactively and donated general fund money to the plan in the sums of $90,000 on July 1, 1990, and $44,999.96 on July 1, 1991.

Southeast Volunteer also made other expenditures. From July 1, 1990, to March 26, 1992, Olson received $47,560.97 in salary from Southeast Volunteer, paid out of the general fund of the organization. Olson was the only member of Southeast Volunteer who was paid a salary on a yearly basis; he received $36,000 annually for operating and managing the bingo facility. Olson's duties as operations manager were as follows: making the facility ready for the game; ensuring that the rent and bills were paid; hiring and overseeing the gaming workers; keeping records and reporting on the gaming activities, including preparing tax returns and payroll; accepting deliveries; preparing food; keeping inventory of bingo paper and pickle cards; getting the cash register drawers ready; overseeing the conduct of the bingo games and pickle card sales; cleaning up the facility at the end of a bingo occasion (such an occasion being a single gathering or session at which a series of bingo games are played); repairing and maintaining the building; and renting the bingo facility to third parties. In addition, Olson and Booth had authority to sign checks on Southeast Volunteer's accounts.

On February 15, 1992, Olson, with the approval of Booth, received a check from Southeast Volunteer's general fund in the amount of $30,060. That payment was characterized by Southeast Volunteer as an advance on Olson's salary as operations manager. Olson used the payment to consolidate debts and refinance his home mortgage at a lower interest rate.

Even though Olson was president and Booth was secretary-treasurer of Southeast District's board, the $30,060 payment was never discussed with or formally approved by the board; however, it appears that at least one other board member knew of the advance. Neither did Olson provide a written security agreement, nor was there any written agreement concerning the terms and conditions of repayment. After the Department of Revenue began its audit, Olson, in July 1992, began repaying the money through salary reductions. He paid no interest.

Olson and Booth, and they alone, decided that Olson should be paid, in addition to his regular salary as operations manager, $100 per bingo occasion for serving as the gaming manager and $60 per occasion for serving as the caller-cashier. During the period from July 1, 1990, to March 26, 1992, Olson was paid a

total of $14,427 for performing the duties of gaming manager and $8,767 for working as caller-cashier.

## IV. ANALYSIS

### 1. FIRST APPEAL

In urging that the department's decision with respect to the first appeal, involving the 1992-93 licensing period, should be overturned as erroneous, the applicants assert that (a) the gaming funds Southeast Volunteer donated to the retirement plan were proper payroll expenses and thus not prohibited by § 9-211(3) or 9-309(3), (b) the salary advance to Olson was not prohibited by the foregoing statutes, (c) the multiple payments to Olson for working both as the gaming manager and as caller-cashier did not violate § 9-243, and (d) the punishment exacted in the form of denying the issuance of the licenses is excessive.

### (a) Retirement Plan

The applicants first argue that Southeast Volunteer's donations to the retirement plan are within Southeast District's powers and Neb. Rev. Stat. § 35-508 (Reissue 1993), which provides:

> The board of directors shall have the following general powers:
>
> (1) To determine a general fire protection and rescue program for the district;
> . . . .
> (10) To organize, establish, equip, maintain, and supervise a paid, volunteer, or combination paid and volunteer fire department or company to serve the district;
> (11) To employ and compensate such personnel as necessary to carry out the general fire protection and rescue program of the district.

They contend that the funds donated to the retirement plan compensate members of Southeast Volunteer as authorized by § 35-508(11) and that, as such, the retirement plan is a proper nonpickle card related payroll expense. Leaving aside that the argument appears to incorrectly assume that Southeast Volunteer and Southeast District are one and the same entity, the argument further overlooks that the beneficiaries of the

retirement plan are not on the payroll of either Southeast District or Southeast Volunteer. The contributions therefore cannot be related payroll expenses.

However, the applicants further argue that donating money to the retirement plan is a lawful purpose under both §§ 9-211 and 9-309 and the department's Bingo, Lottery, Raffle and Lottery by Pickle Card Regulations, 316 Neb. Admin. Code, ch. 35 (1992). At the relevant time, § 9-211 (Reissue 1991) provided, in relevant part:

(1) Lawful purpose, for a licensed organization making a donation of its profits derived from activities under the Nebraska Bingo Act solely to and for its own organization, shall mean donating such profits for any activity which benefits and is conducted by the organization, including any charitable, benevolent, humane, religious, philanthropic, recreational, social, educational, civic, or fraternal activity conducted by the organization for the benefit of its members.

. . . .

(3) No donation of profits under this section shall (a) inure to the benefit of any individual member of the licensed organization making the donation except to the extent it is in furtherance of the purposes described in this section . . . .

Section 9-309 (Reissue 1991) provides, in relevant part:

(1) Lawful purpose, for a licensed organization making a donation of its net profits derived from its lottery by the sale of pickle cards solely for its own organization, shall mean donating such net profits for any activity which benefits and is conducted by the organization, including any charitable, benevolent, humane, religious, philanthropic, youth sports, educational, civic, or fraternal activity conducted by the organization for the benefit of its members.

. . . .

(3) No donation of net profits under this section shall (a) inure to the benefit of any individual member of the licensed organization making the donation except to the extent it is in furtherance of the purposes described in this section . . . .

The Nebraska Administrative Code provides as examples of permitted activities under §§ 9-211 and 9-309 the following:

> Civic or fraternal activities shall include those activities which confer a benefit on the membership as a whole such as donating money to pay the expenses for officers to travel to regional or national conventions at which organization business is discussed or donating money to fund ceremonies commemorating religious or patriotic holidays. Civic or fraternal activities may also include the construction, acquisition, improvement or maintenance of organization facilities or the payment of general operating expenses of the organization such as non-pickle card related payroll expenses, taxes, insurance or utilities.

316 Neb. Admin. Code, ch. 35, § 303.02A(1)(e) (1992).

Although not controlling, guidance is found in the principles involved in determining whether entities are tax exempt under the provisions of the federal Internal Revenue Code, granting such status to entities operated exclusively for charitable purposes and whose earnings do not inure to the benefit of any individual. In this regard, we look first to *Orange County Agr. Soc., Inc. v. C.I.R.*, 893 F.2d 529 (2d Cir. 1990). To fulfill its purpose of promoting the interests of agriculture and horticulture, the taxpayer therein sponsored an annual county fair. To acquire additional parking during the fairs, it leased adjacent land from Middletown-WallKill Improvement Corporation (M-W). M-W was owned by the taxpayer's three largest shareholders, and the taxpayer's president had served as the president of M-W. In addition to paying rent for the land used for parking, the taxpayer made numerous unsecured and interest-free loans to M-W. In rejecting tax-exempt status, the *Orange County Agr. Soc., Inc.* court found significant that part of the taxpayer's earnings inured to the benefit of private interests in contravention of the requirements of the code, writing:

> There is no evidence in the record indicating whether the full amounts [the taxpayer] loaned to M-W have been or will ever be repaid. . . .
>
> Courts have frequently held that loans extended on advantageous terms by an exempt organization to its founders or shareholders, or to an entity controlled by

them, indicate private inurement in violation of [the provisions of the code]:

"Although control of financial decisions by individuals who appear to benefit personally from certain expenditures does not necessarily indicate inurement of benefit to private individuals, those factors coupled with little or no facts in the administrative record to indicate the reasonableness and appropriateness of the expenses are sufficient to convince us that there is indeed prohibitive private inurement."

*Id.* at 534. See, also, *Church of Scientology of California v. C.I.R.*, 823 F.2d 1310 (9th Cir. 1987), *cert. denied* 486 U.S. 1015, 108 S. Ct. 1752, 100 L. Ed. 2d 214 (1988) (holding that cumulative effect of founder's use of church to promote royalty income for founder, his unfettered control over millions of dollars of church assets, and his receipt of untold thousands of dollars' worth of payments for founding church strongly demonstrated inurement to his benefit).

Insight into the applicants' claim that their donations to the retirement plan benefited the residents and property owners of Southeast District is provided in *Police Benev. Ass'n of Richmond, Va. v. U.S.*, 661 F. Supp. 765 (E.D. Va. 1987), *aff'd* 836 F.2d 547 (4th Cir.), which involved a nonstock corporate police benevolent association composed of active and retired police officers. The stated purpose of the association was to " 'accumulate a fund, the income from which will be used to provide pensions for the maintenance, support and welfare of active members of the [association] who are retired from the Bureau of Police . . . .' " *Id.* at 766. Its articles further provided that " '[n]o part of the assets or net earnings of the [association] shall inure to the benefit of, or be distributable to, any member, director or officer of the [association].' " *Id.* In accordance with those stated objectives, the association paid pension benefits to its members. In concluding that the association did not merit tax-exempt status, the court rejected the association's contention that its purposes were charitable in that the payment of pension benefits relieved the government of some of the burdens caused by retirement and by having to constantly train new recruits. The court concluded that these were not charitable pur-

poses because the association provided a pecuniary benefit for the individuals who chose to join and contribute, and the benefit to the government was incidental.

In another such case, *Policemen's Benevolent Association of Westchester County, Inc.*, 42 T.C.M. (CCH) 1750 (1981), the issues, as framed by the court, were whether the association was operated exclusively for exempt purposes and whether part of its net earnings inured to the benefit of private individuals. Among other expenditures, the association had paid retirement benefits to some of its members. It argued that it had a charitable purpose and that its retirement payments were for a public purpose. In denying tax-exempt status, the court noted that the prohibition of private inurement is entwined with the test to determine tax-exempt status, writing:

> Even though a precise definition of "charitable" is not possible, one salient factor underlies a charitable purpose—the serving of a public rather than a private purpose. . . . Accordingly, in determining whether petitioner's payment of retirement benefits to its members causes it to fail the . . . operational test, we must ascertain the purpose, public or private, those payments achieve.

> Petitioner maintains that its retirement benefits program is designed to lessen the burdens of government and to increase police morale both of which benefit the public. We agree that some general public purposes are served, although they are to a large degree intangible. However, we are unable to find petitioner's primary purpose was to benefit the public. Rather, we find petitioner's dominant motivation was to pass economic benefit to its members— a distinctly private purpose. No one other than petitioner's members, even other Westchester County policemen, are eligible for the retirement benefits. Moreover, payment of benefits is in no way based on need. In effect, petitioner is operating a publicly-funded, non-qualified pension plan, and any intended benefit to the public is merely incidental.

*Id.* at 1752.

We find the foregoing principles applicable to the issues presented here and adopt them. Thus, the retirement plan contributions do not constitute a use for the lawful purposes permitted

by §§ 9-211 and 9-309, for they inure to the benefit of Southeast Volunteer's individual members and, contrary to Southeast Volunteer's claim, cannot be said to constitute a charitable activity by facilitating the recruitment and retention of volunteer firefighters for Southeast District. The legal reality is that the benefits inure directly to the benefit of Southeast Volunteer's firefighter members and only incidentally to residents and property owners of Southeast District.

### (b) Salary Advance

The foregoing analysis demonstrates that the salary advance to Olson is equally indefensible; it inured solely to Olson's benefit, in violation of the aforecited statutes and regulations.

### (c) Multiple Payments

We thus reach the matter of the payments to Olson for acting both as gaming manager and as caller-cashier. At the relevant time, § 9-243 (Reissue 1991) provided:

> Any member designated responsible for the proper utilization of gross receipts shall not receive any compensation greater than an amount equal to five dollars per hour for each hour such person acted as such. Any person conducting bingo and any designated supervising member shall not receive any compensation greater than thirty dollars per bingo occasion or limited period bingo occasion, except that any person whose primary duty is calling bingo or acting as a cashier shall not receive any compensation greater than an amount equal to sixty dollars per bingo occasion or limited period bingo occasion. A gaming manager shall not receive any compensation greater than an amount equal to one hundred dollars per bingo occasion or limited period bingo occasion regardless if such compensation is paid entirely from the licensed organization's bingo account or in part from other gaming activities authorized or regulated under Chapter 9 and conducted by the licensed organization.

At the relevant time, a gaming manager was defined in § 9-209.01 (Reissue 1991) as

any person who is responsible for the supervision and operation of a bingo game on behalf of a licensed organization, including the conduct or operation of any lottery by the sale of pickle cards or any other kind of gambling activity at a bingo game which is authorized or regulated under Chapter 9. He or she shall be the authority on the premises where the bingo game is conducted and shall supervise and direct other people working at such bingo game.

The gaming manager's duties are described in 316 Neb. Admin. Code, ch. 35, § 216.04 (1992), as follows:

A licensed gaming manager shall be present for the duration of each bingo occasion he or she manages. The gaming manager shall be the ultimate authority on the premises of the bingo occasion. The gaming manager shall have the following duties:

216.04A To supervise and direct all bingo workers as well as other individuals assisting in the conduct of gaming activities at the bingo occasion;

216.04B Ensuring that no one under the age of 18 years of age participates in the conduct or playing of bingo . . . or lotteries . . . and that . . . no alcoholic beverages are served in the area of the premises in which bingo is conducted;

216.04C Resolving any disputes which may occur during the conduct of the bingo occasion;

216.04D Ensuring that the organization awards at least fifty percent of its gross receipts from the conduct of bingo in prizes and that . . . the total prizes awarded for a bingo occasion do not exceed $4,000.00;

216.04E Ensuring that all receipts received from the conduct of gaming activities at the bingo occasion are turned over to a supervising member or utilization of funds member of the licensed organization for deposit into the appropriate bank account of the organization;

216.04F Ensuring that complete and accurate records of all gaming activities conducted at the bingo occasion are kept; and

216.04G Ensuring that all gaming activities at the bingo occasion are conducted in accordance with the Nebraska Bingo Act, Nebraska Pickle Card Lottery Act . . . or any rules or regulations promulgated under those Acts.

The terms "caller" and "cashier" are not defined in the statutes, and we have not been directed to any regulation defining them.

In resolving this issue, we recall that in construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Van Ackeren v. Nebraska Bd. of Parole, ante* p. 477, 558 N.W.2d 48 (1997); *Rauert v. School Dist. 1-R of Hall Cty., ante* p. 135, 555 N.W.2d 763 (1996); *Village of Winside v. Jackson,* 250 Neb. 851, 553 N.W.2d 476 (1996). Statutory language is to be given its plain and ordinary meaning; in addition, the courts will, if possible, try to avoid a construction which would lead to absurd, unconscionable, or unjust results. *Kuhlmann v. City of Omaha, ante* p. 176, 556 N.W.2d 15 (1996); *Nichols v. Busse,* 243 Neb. 811, 503 N.W.2d 173 (1993). Moreover, in construing a statute, a court must look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served, and then must place on the statute a reasonable or liberal construction that best achieves the statute's purpose, rather than a construction that defeats the statutory purpose. *CenTra, Inc. v. Chandler Ins. Co.,* 248 Neb. 844, 540 N.W.2d 318 (1995). Finally, when a challenged statute is susceptible of more than one reasonable construction, a court uses the construction that will achieve the purposes of the statute and preserve the statute's validity. *Callan v. Balka,* 248 Neb. 469, 536 N.W.2d 47 (1995); *Ehlers v. Perry,* 242 Neb. 208, 494 N.W.2d 325 (1993).

With these rules in mind, we note that there is no language in the statutes, and we are directed to none in the regulations, which expressly states one person cannot perform the duties of both gaming manager and caller-cashier. However, as neither is there any express language that one person can do both jobs, the department argues that the language stating "[a] gaming manager shall not receive any compensation greater than an amount equal to one hundred dollars per bingo occasion" means that

$100 was the maximum that a person acting as gaming manager could be paid no matter what duties such a person performed. See § 9-243 (Reissue 1991). However, the plain and ordinary meaning of this language is that $100 was the maximum allowed for performing the gaming manager's duties. The statute did not provide that a gaming manager called upon to also perform other nonlicensed duties must perform them without pay. Had the Legislature so intended, it could easily have so provided.

### (d) Sanction

Thus, in considering the appropriateness of the license denials, we are concerned only with unlawful donations to the relevant plan and the unlawful salary advance to Olson.

At the relevant time, § 9-226 (Reissue 1991) provided, in relevant part:

> The department shall have the following powers, functions, and duties:
>
> . . . .
>
> (2) To deny any license application or renewal application for cause. Cause for denial of an application for or renewal of a license shall include instances in which the applicant or licensee or any person with a substantial interest therein: (a) Violated the provisions, requirements, conditions, limitations, or duties imposed by the Nebraska Bingo Act . . . the Nebraska Pickle Card Lottery Act . . . or any rules or regulations adopted and promulgated pursuant to the acts . . . .

Section 9-262(1) (Reissue 1991) reads:

> Except when another penalty is specifically provided, any person, distributor, licensed organization, other licensee, or employee or agent of any person or licensee who violates any provision of the Nebraska Bingo Act shall be guilty of a Class I misdemeanor for the first offense and a Class IV felony for any second or subsequent violation. Any licensed organization guilty of violating any provision of the Nebraska Bingo Act more than once in a twelve-month period shall have its license canceled or revoked.

Section 9-352(1) contains almost the identical language with regard to the pickle card activities.

Thus, it is clear that the department had the authority to deny the licenses at issue. The question is whether such denials are arbitrary or capricious. A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996); *Central Platte NRD v. City of Fremont*, 250 Neb. 252, 549 N.W.2d 112 (1996). A capricious decision is one guided by fancy rather than by judgment or settled purpose; such a decision is apt to change suddenly; it is freakish, whimsical, humorsome. *Ponderosa Ridge LLC, supra*; *Central Platte NRD, supra*; *In re Application of Jantzen*, 245 Neb. 81, 511 N.W.2d 504 (1994).

The record demonstrates that the denials were not guided by fancy or made with a disregard of the facts or circumstances. Rather, they were made in accordance with the provisions of the relevant statutes. Accordingly, the sanctions are clearly not excessive, and in fact, conform to the law, are supported by competent evidence, and are not arbitrary, capricious, or unreasonable.

### 2. Second Appeal

With regard to the second appeal, covering the 1993-94 licensing period, the applicants assert that the district court erred in ruling that summary judgment is appropriate in a proceeding before the department.

Both § 9-226.01 (Reissue 1991) of the Nebraska Bingo Act and § 9-322.02 (Reissue 1991) of the Nebraska Pickle Card Lottery Act require the department to give notice of its intention to deny an application, and provide for proceedings which are to be considered contested cases pursuant to the Administrative Procedure Act, § 84-913, which provides, in relevant part: "In any contested case all parties shall be afforded an opportunity for hearing after reasonable notice. . . . Opportunity shall be afforded all parties to present evidence and argument with respect thereto."

In *Buckingham v. Creighton University*, 248 Neb. 821, 539 N.W.2d 646 (1995), we held that as the Workers' Compensation Court is not statutorily authorized to grant motions for summary judgment, it cannot grant such judgments. We reasoned that as the compensation court is of statutory creation, its powers are appropriately limited to those delineated in the statute.

Administrative bodies likewise have only that authority specifically conferred upon them by statute or by construction necessary to achieve the purpose of the relevant act. *Grand Island Latin Club v. Nebraska Liq. Cont. Comm., ante* p. 61, 554 N.W.2d 778 (1996); *CenTra, Inc. v. Chandler Ins. Co.*, 248 Neb. 844, 540 N.W.2d 318 (1995); *Chrysler Corp. v. Lee Janssen Motor Co.*, 248 Neb. 281, 534 N.W.2d 568 (1995). Neither the Nebraska Bingo Act, the Nebraska Pickle Card Lottery Act, nor the Administrative Procedure Act authorizes the granting of summary judgment.

That being so, the department erroneously disposed of the issues involved in the 1993-94 licensing period by summary judgment, and the district court erred in affirming that decision.

### V. JUDGMENT

Accordingly, as noted in part I, we affirm the district court's judgment in the first appeal, and in the second appeal, we reverse the judgment of the district court and remand the matter thereto with the direction that it remand the matter to the department for further proceedings.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTION.