JIM MILLER, APPELLEE, V. MEISTER & SEGRIST, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLEE, GRE INSURANCE GROUP, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLANT, AND UNITED STATES FIDELITY & GUARANTY COMPANY, DEFENDANT, AND STATE OF NEBRASKA, SECOND INJURY FUND, THIRD-PARTY DEFENDANT, APPELLEES.

587 N.W.2d 399

Filed December 18, 1998.　No. S-98-050.

John F. Simmons, of Simmons, Olsen, Ediger, Selzer, Ferguson & Carney, P.C., for appellant.

Tylor J. Petitt, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, for appellee Miller.

Richard A. Douglas, of Nichols, Douglas, Kelly, and Meade, for appellees Meister & Segrist and United States Fidelity & Guaranty Company.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee Second Injury Fund.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Appellee Jim Miller originally brought this action against appellee Meister & Segrist, his employer, for workers' compensation benefits. Appellant, GRE Insurance Group (GRE), Meister & Segrist's insurer, then brought an action as a third-party plaintiff against appellee State of Nebraska, Second Injury Fund (Fund) as a third-party defendant. In its third-party petition against the Fund, GRE argued that the Fund was liable for part of Miller's injuries even though Miller's injuries were not classified as permanent. Thus, the instant case presents the question, Can the Fund be liable to an employee who has not received a permanent disability rating? We conclude that the Fund cannot be held liable unless a permanent disability rating has been awarded. Therefore, we affirm in part, and in part reverse.

## BACKGROUND

### 1992 INJURY

Miller, who had undergone surgeries due to a back injury suffered in 1985, incurred additional injuries to his neck and lower back while lifting a 5-gallon water jug in August 1992. The injuries arose out of and occurred in the scope of Miller's employment with Meister & Segrist. The parties stipulated that United States Fidelity & Guaranty Company (USF&G) was acting as Meister & Segrist's insurer at that time.

Douglas W. Beard, M.D., treated Miller for his 1992 injuries. Beard concluded that Miller should have surgery performed on his lower back, but Miller declined to have the surgery. However, Beard also stated that "delaying surgical intervention until such time as [Miller] feels it warranted poses him no substantial risk of great deterioration" and that he was "not in disagreement in [Miller's] present attempt to postpone this [surgery] as long as possible." Miller did not have surgery performed on his lower back as a result of the 1992 injuries.

However, Miller did have surgery performed on his neck. Miller underwent cervical fusion on September 1, 1993, via an anterior cervical decompression with grafting from levels C4 to C7, and a titanium locking plate was inserted.

As of March 18, 1994, Beard had "no specific further treatment recommendations concerning Mr. Miller." Beard noted that Miller had not missed substantial amounts of work as a result of the 1992 injuries and that any further treatment "would be aimed primarily at controlling resurgence or flares of symptomatology." Beard reexamined Miller on August 12 and concluded that Miller had reached maximum medical improvement.

Miller continued to see Beard on an intermittent basis, reporting that his condition was continuing to deteriorate. Miller was given an MRI, and on September 4, 1995, it was Beard's conclusion that lower back surgery would be helpful but was not mandatory.

Miller was also examined by Scott J. Primack, D.O. On July 1, 1994, Primack stated that "[n]o further medical treatment with the exception of an individualized exercise program emphasizing both aerobic and isometric strengthening as well as a flexibility program is necessary." He concluded that Miller had reached maximum medical improvement as of that date but that Miller would have further degenerative changes secondary to his previous injuries and surgeries.

Primack concluded that Miller's pain was not entirely due to his 1992 injury, although that injury was a partial factor. In Primack's opinion, Miller's pain was due in part to his prior degenerative joint disease and a prior surgery performed in 1986. Beard had likewise concluded that Miller evidenced degenerative disk disease changes in both the cervical and lumbar regions and that they were "age related changes [that] likely preexisted his injury." However, Beard noted that Miller was largely asymptomatic prior to his 1992 injuries and that his discal pathology was "certainly potentially attributable to the August 13, 1992, incident." He concluded that Miller's injuries stemming from the 1992 incident were not a "substantial aggravation of any previous condition."

Primack again examined Miller on September 1, 1995, and noted that Miller's condition had recently worsened. Primack concluded that the symptoms Miller was suffering at that time were not specifically work-related, but, rather, were the result of a natural spine degradation process. It was Primack's opinion that Miller should not wait long to have surgery.

## 1996 INJURY

Miller was injured yet again on February 27, 1996, when he slipped and fell, injuring his leg and back. The injury arose out of and occurred in the scope of Miller's employment with Meister & Segrist. As a result of these injuries, Miller has been temporarily totally disabled.

Beard saw Miller on March 1, 1996. Beard stated that he "planned to continue to treat [Miller] conservatively." During a follow-up appointment on March 18, Beard indicated that Miller might need to proceed with immediate surgical intervention. Miller agreed to schedule surgery once his "life affairs" were in order. Beard considered the delay appropriate.

At the time the 1996 injuries occurred, GRE was the workers' compensation carrier for Meister & Segrist. Miller was earning an average weekly wage of $701.92, entitling him to benefits of $409 per week commencing on February 27, 1996, and continuing until such time as Miller was no longer temporarily totally disabled. However, GRE paid benefits to Miller only from February 27 until November 2, 1996, when it discontinued its payments.

USF&G has paid benefits to Miller for the 1992 incident from September 8, 1993, until at least the time of trial in the Workers' Compensation Court.

The instant case was originally brought by Miller against Meister & Segrist for benefits allegedly due as the result of his 1996 injuries. After Meister & Segrist answered, GRE entered the case as an additional defendant and filed a cross-claim against USF&G as an additional defendant and a third-party petition against the Fund as a third-party defendant. The cross-claim was premised upon GRE's assertion that any disability suffered by Miller due to his 1996 injuries was in part the result of the 1992 injuries and that benefits should be paid by USF&G. The third-party petition was premised upon GRE's assertion that on the date the 1996 injuries were incurred, Miller had a preexisting permanent partial disability supporting a rating greater than 25 percent, making the Fund liable for benefits accruing from the 1996 injuries.

In a deposition taken on February 20, 1997, Beard acknowledged that Miller suffered from degenerative changes that pre-

existed the 1985 injury and that they would have likely progressed over time. However, when asked whether Miller would be in his present condition had he not fallen, Beard responded by stating that Miller's 1996 fall "may have been the final event that pushed him over the edge." Beard opined that the 1996 fall was a new injury superimposed on an existing injury. It was Beard's opinion that 20 percent of Miller's current disability was attributable to the 1985 injuries, 50 percent to the 1992 injuries, and the remaining 30 percent to his fall in 1996.

### WORKERS' COMPENSATION COURT'S DETERMINATION

In a detailed order, the Worker's Compensation Court found that Miller had not unreasonably refused medical treatment by postponing his lower back surgery. The court found that Miller's 1996 fall "aggravated his preexisting condition to the point where he is now completely disabled." The court concluded that this finding required that GRE's cross-claim against USF&G be dismissed, since Miller's current disability was not the result of a progression of his 1992 injuries, and that no surgery would ever have been undertaken but for the 1996 fall. The court noted that Miller planned to undergo surgery when his life affairs were in order. Accordingly, the court found that he had not yet reached maximum medical improvement and was entitled to a running award of temporary total disability. As for the Fund, the court found that it was liable, but that the extent of its liability could not yet be determined because Miller's disability was still considered temporary. The court found that GRE should continue to pay for Miller's future medical and hospital services reasonably necessary as a result of his injuries. Finally, the court found that Miller was entitled to a 50-percent waiting-time penalty from Meister & Segrist and GRE due to their failure to pay any benefits beyond November 2, 1996.

The court ordered that Meister & Segrist and GRE continue to pay temporary total disability in the sum of $409 per week for so long as Miller remains temporarily totally disabled. Once Miller's temporary total disability ceases, the court ordered that he be entitled to any residual permanent partial disability with credit to be given Meister & Segrist and GRE for disability compensation paid. The order also provided that once Miller's

temporary total disability ceases, a hearing may be had to determine the Fund's liability.

The trial court's order was reviewed by a panel of the Worker's Compensation Court. The panel concluded that the trial court's dismissal of USF&G was based upon a factual question as to whether or not the 1996 injury was a recurrent event to an earlier injury or whether it was an aggravation of a preexisting condition. The panel determined that there was sufficient evidence to support the trial court's finding. The panel also determined that sufficient evidence supported the trial court's finding that Miller had not reached maximum medical improvement and that until he does, the liability of the Fund cannot be determined. GRE was ordered to pay $500 in attorney fees to Miller because GRE failed to obtain a reduction in the amount awarded Miller.

## ASSIGNMENTS OF ERROR

GRE asserts the trial court erred in (1) determining that the extent of the liability of the Fund could not be determined at this time, (2) dismissing the cross-claim against USF&G and directing all benefits to be paid by GRE, and (3) ordering GRE to pay an attorney fee to Miller.

## SCOPE OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Reissue 1993), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. Upon appellate review, the findings of fact made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. With respect to questions of law in workers' compensation cases, an appellate court is obligated to make its own determination. *Crouch v. Goodyear Tire & Rubber Co., ante* p. 128, 582 N.W.2d 356 (1998).

## ANALYSIS

### SECOND INJURY FUND

GRE argues that the elements establishing the Fund's liability have been met and that the Fund is liable for Miller's temporary benefits. More specifically, GRE contends that the compensation court erred in failing to determine the extent of the Fund's liability. The Fund disagrees, contending that its liability cannot be determined at all until a percentage of disability rating for the last injury standing alone and by itself has been determined. Although the Fund did not cross-appeal, the compensation court's finding that the Fund is liable is a pivotal issue. If the Fund cannot be held liable at all, then GRE's contention concerning the extent of the Fund's liability is necessarily without merit. Thus, the issue is whether the Fund may be liable to Miller even though he has not received a permanent disability rating for his 1996 injuries.

To determine the Fund's liability, we must look to Neb. Rev. Stat. § 48-128 (Reissue 1993), which states:

(1) If an employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, which is or is likely to be a hindrance or obstacle to his or her obtaining employment or obtaining reemployment if the employee should become unemployed and which was known to the employer prior to the occurrence of a subsequent compensable injury, receives a subsequent compensable injury resulting in additional permanent partial or in permanent total disability so that the degree or percentage of disability caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself, and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability. . . .

. . . .

(3) As used in this section, preexisting permanent partial disability shall mean any preexisting permanent con-

dition, whether congenital or the result of injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining reemployment if the employee should become unemployed. No condition shall be considered a preexisting permanent partial disability under this section unless it would support a rating of twenty-five percent loss of earning power or more or support a rating which would result in compensation payable for a period of ninety weeks or more for disability for permanent injury . . . .

In sum, the elements required to establish the Fund's liability are (1) a prior permanent partial disability known to the employer and hindering the employee's employability, (2) a subsequent compensable injury causing permanent disability to the employee, and (3) a combined permanent disability substantially greater in degree or percentage than would have resulted from the subsequent injury considered alone. See *Crouch v. Goodyear Tire & Rubber Co., supra.*

GRE relies on this court's holding in *Parker v. St. Elizabeth Comm. Health Ctr.*, 226 Neb. 526, 412 N.W.2d 469 (1987). In *Parker*, the issue was stated to be whether the Fund may be liable for "other than permanent disability." *Id.* at 527, 412 N.W.2d at 471. Parker, the employee, had polio as a child. On July 15, 1982, he experienced a compensable injury while employed by St. Elizabeth Community Health Center. He had surgery on September 29, 1983, and returned to work on November 1. He was later terminated by the health center in 1985 and gained employment selling home water treatment systems. Parker's condition deteriorated, and he resigned from his new job in April 1986.

A review panel of the Workers' Compensation Court found that Parker was temporarily totally disabled from July 15 through August 28, 1982; from September 29 through October 31, 1983; and from May 1 through July 24, 1986, which was the date of the rehearing, and that he would "remain temporarily totally disabled for an indefinite period of time." *Id.* at 528, 412 N.W.2d at 472. The panel further found that Parker's polio was a permanent partial disability; that Parker's subsequent injury, when combined with his preexisting disability, resulted in a

substantially greater degree or percentage of disability than would have occurred due to the subsequent injury alone; that the health center had knowledge of Parker's preexisting condition; and that when Parker's total disability should cease, he would be entitled to compensation for any residual permanent partial disability. The panel found that the subsequent injury Parker suffered would of itself have caused only a 5-percent permanent partial disability to Parker's body as a whole and that the Fund was liable for the additional disability.

Accordingly, the panel ordered the Fund to pay 95 percent of Parker's benefits from May 1, 1986, for so long as Parker shall remain totally disabled. If Parker were to remain totally disabled for more than 300 weeks, the Fund was to pay the entire amount of Parker's benefits. If Parker's total disability were to cease prior to the passage of 300 weeks, the Fund was to pay compensation for that permanent partial disability that Parker thereafter suffered in excess of 5 percent.

On appeal, the Fund urged this court to reverse the panel's order, noting that § 48-128 mentions only permanent partial or permanent total disability. The Fund argued that it could not be held liable until a finding of permanent disability was made. This court disagreed:

> [The employee] should not be denied compensation simply because the Workers' Compensation Court used the term "temporary" instead of "permanent," nor should [the employer] be required to pay this compensation. [T]o carry out the purposes of the Fund, the [compensation] court correctly ordered that the Fund pay temporary total disability benefits to [the employee].

*Parker v. St. Elizabeth Comm. Health Ctr.*, 226 Neb. 526, 535, 412 N.W.2d 469, 475 (1987).

This court relied on *Pollard v. Wright's Tree Service, Inc.*, 212 Neb. 187, 322 N.W.2d 397 (1982), in reaching the above conclusion. In *Pollard*, like *Parker*, the Fund argued on appeal that it could not be held liable for an employee's injuries in the absence of a finding that the employee's disability was permanent. This court held that the Fund was liable for payment of benefits and that no finding of permanent disability was necessary. "Whether the ultimate amount of permanent disability

after rehabilitation is 60 percent, 80 percent, or total, the Second Injury Fund is liable for it." *Pollard v. Wright's Tree Service, Inc.*, 212 Neb. at 193, 322 N.W.2d at 402.

Thus, *Parker* and *Pollard* suggest that the Fund may be held liable absent a permanent disability rating. However, a close reading of *Parker* and *Pollard* indicates that the Fund was held liable because it was undisputed that the employees were permanently disabled, rather than temporarily disabled.

> The record reflects that the medical treatment for [the employee's] physical injuries has been completed and the employer has been assessed with that cost. The only further medical treatment contemplated is for the purpose of pain rehabilitation. *Under such circumstances* there should be little question but that the physical injuries currently present *are permanent rather than temporary*. The plaintiff should not be denied compensation for what is currently total permanent disability simply because his employability and earning capacity might become enhanced by rehabilitation and his permanent disability possibly reduced at some time in the future. . . . The award against the Second Injury Fund in the present case was for permanent disability and was properly entered.

(Emphasis supplied.) *Pollard v. Wright's Tree Service, Inc.*, 212 Neb. at 193-94, 322 N.W.2d at 402. Likewise, in *Parker*, the review panel labeled the employee's disability as "temporary" even though it found that his disability would be total for an "indefinite period."

Thus, in *Parker* and *Pollard*, this court concluded that the review panel was clearly wrong in labeling the employee's disability as temporary rather than permanent and not that the amount of the Fund's liability could be determined even though the injury was temporary.

In the instant case, Miller has contemplated surgery and has indicated that he will schedule surgery once his life affairs are in order. Accordingly, there is competent evidence indicating that Miller's current percentage of disability is temporary. Therefore, we conclude that the compensation court was not clearly wrong in finding that Miller's injuries were temporary. We note that there is no evidence before this court as to whether

Miller has indeed had the surgery. If Miller has not yet had the surgery and he continues to postpone it indefinitely, his injuries, at some point, may become permanent and modification may be sought. See Neb. Rev. Stat. § 48-141 (Reissue 1993).

Because we have concluded that the compensation court was not clearly wrong in finding that Miller's injuries are temporary, we must still address the question of whether the Fund may be held liable even though Miller's injuries are not permanent. In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998). The plain language of the statute clearly indicates that the Fund's liability cannot be determined until and unless the employee's subsequent injury is "permanent." Because the Fund cannot be held liable until an employee's injuries are considered permanent, the extent of the Fund's liability likewise cannot be determined. Thus, we conclude that the compensation court did not err in finding that the extent of the liability of the Fund could not be determined, but did err in determining that the Fund was liable.

## CROSS-CLAIM

GRE argues that the compensation court erred in dismissing its cross-claim against USF&G. We disagree.

When a subsequent injury aggravates a prior injury, the insurer at risk at the time of the subsequent injury is liable. *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 529 N.W.2d 783 (1995); *Pacher v. Fairdale Farms*, 166 Vt. 626, 699 A.2d 43 (1997). See, also, 9 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 95.21-22 (1998). However, if the subsequent injury is a recurrence of the prior injury, the insurer at risk at the time of the prior injury is liable. *Hull v. Aetna Ins. Co., supra; Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987); *Pacher v. Fairdale Farms, supra.* As we stated in *Mendoza*, quoting Larson's Workers' Compensation Law, " 'There is . . . a fine line separating aggravations from recurrences . . . .' " (Omissions in original.) *Mendoza* at 782, 408 N.W.2d at 287. Nonetheless, "[a] finding with regard to

causation of an injury is one for determination by the compensation court as the fact finder." *Rodriquez v. Prime Meat Processors*, 228 Neb. 55, 63, 421 N.W.2d 32, 37 (1988).

In the instant case, the compensation court specifically found that Miller's 1996 injuries were an aggravation of his previous condition. Furthermore, this finding is supported by competent evidence and is not clearly wrong. Thus, the insurer at risk at the time of the 1996 injuries, GRE, bears liability. Accordingly, we conclude that the compensation court was correct in dismissing USF&G as a party.

## ATTORNEY FEES

GRE argues that the review panel erred in ordering GRE to pay $500 in attorney fees to Miller, because GRE was not seeking to reduce Miller's award, but, rather, was seeking to apportion that award.

Neb. Rev. Stat. § 48-125(1) (Reissue 1993) authorizes attorney fees if "the employer files an application for review before the compensation court from an award of a judge of the compensation court and fails to obtain any reduction in the amount of such award . . . ." A workers' compensation insurance carrier, such as GRE, is an "employer" within the meaning of this section. *Neeman v. Otoe County*, 186 Neb. 370, 183 N.W.2d 269 (1971). Ordinarily, the phrase "reduction in the amount of such award" found in this section refers to the total amount of the award to the employee, but includes the issue of total disability. *Behrens v. American Stores Packing Co.*, 228 Neb. 18, 421 N.W.2d 12 (1988). See, also, *Mulder v. Minnesota Mining & Mfg. Co.*, 219 Neb. 241, 361 N.W.2d 572 (1985). Does the phrase include an attempt to apportion the responsibility for payment of an award among insurers and the Fund?

In *Pollard v. Wright's Tree Service, Inc.*, 212 Neb. 187, 322 N.W.2d 397 (1982), the compensation court determined that the insurer/employer had obtained a "reduction" in the award by successfully shifting liability to the Fund. On appeal, this court reversed the compensation court's decision, stating:

> It seems clear that "reduction in the amount of such award" ordinarily refers to the total amount of the award to the employee and not to a reduction in the amount to be

paid by a specific defendant who is liable to pay a portion of the award. In this case there was no reduction in the total amount of the award to the plaintiff. The only change which occurred was that the Second Injury Fund was held liable for a portion of the award rather than the tree service, which was liable alone on the initial award. The action of the compensation court in refusing to make an award of attorney fees to the plaintiff was in error.

*Id.* at 194-95, 322 N.W.2d at 403.

Accordingly, this court held that the insurer/employer was liable for attorney fees under § 48-125. Thus, *Pollard* clearly indicates that attorney fees are appropriate under § 48-125 even when the action does not seek to reduce the employee's award, but, rather, seeks to apportion responsibility for payment of the award among insurers and the Fund.

We conclude that the Workers' Compensation Court did not err in awarding attorney fees.

## CONCLUSION

Because Miller's injuries were not permanent, we conclude that the compensation court erred in determining that the Fund is liable. However, the compensation court did not err in dismissing USF&G and awarding attorney fees.

AFFIRMED IN PART, AND IN PART REVERSED.