CENTRAL STATES FOUNDATION, A NEBRASKA NOT-FOR-PROFIT CORPORATION, APPELLANT, V. M. BERRI BALKA, TAX COMMISSIONER, STATE OF NEBRASKA, AND THE NEBRASKA DEPARTMENT OF REVENUE, APPELLEES.

590 N.W. 2d 832

Filed March 5, 1999.   No. S-97-1192.

Michael E. Kozlik and Robert S. Lannin, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, P.C., for appellant.

Don Stenberg, Attorney General, and L. Jay Bartel for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

Gerrard, J.

## NATURE OF CASE

The Youth Athletic Association (YAA) is a nonprofit organization licensed to sell pickle cards. Central States Foundation (Central States) is a nonprofit organization which is not licensed to sell pickle cards, but to which the YAA had donated pickle card proceeds. In order to determine that the YAA's pickle card proceeds were being disbursed lawfully, M. Berri Balka in his capacity as Tax Commissioner of the State of Nebraska and the Nebraska Department of Revenue (collectively the Department) notified Central States that the Department would conduct an audit of Central States.

Central States sued in Lancaster County District Court, seeking an injunction against the audit. The district court denied a permanent injunction, and Central States appealed. We moved the case to the Nebraska Supreme Court docket on our own motion. The question presented in this appeal is whether the Department may audit the records of an organization which is not licensed to sell pickle cards but does receive pickle card revenues from a licensee.

## FACTUAL BACKGROUND

The Nebraska Pickle Card Lottery Act, Neb. Rev. Stat. §§ 9-301 through 9-356 (Reissue 1997), provides for licensed nonprofit organizations to raise revenue by selling pickle cards. A pickle card is a form of lottery which affords a person the opportunity to win a cash prize by removing a tab from the card to reveal a set or combination of numbers, letters, or symbols. See § 9-315.

The Department is charged by statute with the responsibility of regulating the issuance, renewal, and revocation of licenses; to enforce the terms of the Nebraska Pickle Card Lottery Act; to regulate compliance with the requirements of the Nebraska Pickle Card Lottery Act; and to investigate potential violations. See §§ 9-306 and 9-322. The primary function of this enforcement and regulation capacity is to ensure that pickle card revenues are used for lawful purposes, which may be generally described as purposes which are charitable or benefit the public welfare. See § 9-309.

The Department conducted an audit of the YAA, as authorized by § 9-322(9), and discovered that much of the YAA's pickle card revenue was being directed to Central States. In total, the Department determined that of $177,365.90 designated by the YAA as "donated to charity" between July 5, 1995, and June 30, 1996, $159,000 was given to or benefited Central States.

The Department informed Central States by letter that the Department had scheduled an audit of Central States in order for the Department to review and examine all books and records pertaining to compliance with the Nebraska Pickle Card Lottery Act. Central States then filed a petition in district court against the Department, asking that the Department be enjoined from any examination of Central States' books and records pertaining to compliance with the Nebraska Pickle Card Lottery Act. Central States also alleged that an audit would be a violation of its rights under the Fourth Amendment to the U.S. Constitution.

The district court granted a temporary injunction against the audit, and a hearing was subsequently held to adduce evidence relating to Central States' request for permanent injunctive relief. After the hearing, the district court found that the evidence adduced indicated a "substantial interrelationship" between the YAA and Central States.

For instance, Thomas Prendergast, the president of Central States, is also a pickle card " 'sales agent' " for the YAA. The YAA donated most of its pickle card revenue to Central States, as detailed above. In addition, one of the payments made for Central States' benefit was the purchase of a $49,000 cashier's check on July 5, 1995. This coincided with the July 6 purchase of a day-care center by Central States for $50,000. Janet Breeling, the seller of the day-care center, reported that the sale was negotiated for Central States by F. Dennis French (French) and Lenore French, respectively the president and secretary-treasurer of the YAA. Central States had provided French with documents, including a " 'Special Power of Attorney.' " Breeling reported that she provided training in the operation of the day-care center to David Dowthitt, an officer of the YAA. Breeling indicated that the only officer of Central States she met was Prendergast, whom she met at the closing of the sale.

Furthermore, bank records obtained by the Department showed that payments were made by Central States to French, Dowthitt, and Prendergast. During March and April 1996, French received $6,907.03, Dowthitt received $2,654.22, and Prendergast received $1,388.21 from Central States. In addition, $2,400 was paid by Central States to Dowthitt "d/b/a Best Enterprises," a company that is in the business of selling and servicing pickle card dispensing machines.

Ultimately, the district court denied Central States' request for permanent injunctive relief. The district court determined that "the Department has the legitimate, legislatively authorized purpose of determining whether $159,000.00 (out of $177,000.00 available for charitable use) was used for legitimate purposes under the Nebraska Pickle Card Lottery Act." The district court dissolved the temporary injunction, denied Central States' motion for permanent injunction, and dismissed Central States' petition. Central States timely appealed.

## ASSIGNMENTS OF ERROR

Central States assigns, restated, that the district court erred (1) in dissolving the temporary injunction and denying Central States' motion for a permanent injunction, (2) in concluding that the Nebraska Pickle Card Lottery Act authorizes the Department to conduct an audit of Central States, (3) in sustaining the Department's objection to portions of an affidavit submitted by Prendergast, (4) in overruling Central States' objection to the introduction of bank records, and (5) in concluding that the Department's actions did not violate Central States' right to be free from unreasonable searches and seizures.

## STANDARD OF REVIEW

Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below. *Nicholson v. General Cas. Co. of Wis.*, 255 Neb. 937, 587 N.W.2d 867 (1999).

## ANALYSIS

### STATUTORY AUTHORITY TO AUDIT CENTRAL STATES

Central States claims that the Department has no authority to audit Central States' records. The Department argues that it is

authorized to do so pursuant to § 9-322(9). That statute provides, in relevant part, that the Department shall have the power, function, and duty to

> examine or to cause to have examined, by any agent or representative designated by the department for such purpose, any books, papers, records, or memoranda relating to the conduct of lottery by the sale of pickle cards of any licensee, to require by administrative order or summons the production of such documents or the attendance of any person having knowledge in the premises, to take testimony under oath, and to require proof material for its information. If any such person willfully refuses to make documents available for examination by the department or its agent or representative or willfully fails to attend and testify, the department may apply to a judge of the district court of the county in which such person resides for an order directing such person to comply with the department's request.

*Id.*

Central States argues that this section does not authorize the Department to audit any organization that is not a pickle card licensee. The Department maintains that it is empowered to audit an organization that receives pickle card revenues, regardless of whether that organization is itself licensed to sell pickle cards.

Resolution of this issue rests on the meaning of the phrase "books, papers, records, or memoranda *relating to the conduct of lottery* by the sale of pickle cards." (Emphasis supplied.) See *id.* In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Miller v. Meister & Segrist*, 255 Neb. 805, 587 N.W.2d 399 (1998).

It is well understood that "[t]he ordinary meaning of [the phrase 'relating to'] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L. Ed. 2d

157 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). Accord *Contractors Ass'n v. West Virginia DPS*, 189 W. Va. 685, 434 S.E.2d 357 (1993). Compare *In re Estate of Andersen*, 253 Neb. 748, 572 N.W.2d 93 (1998).

Other courts have stated that "relating to" means "in respect to; in reference to; in regard to." *Snowden v. School Dist. No. 401*, 38 Wash. 2d 691, 698, 231 P.2d 621, 625 (1951). See, also, *Harris v. State*, 260 Ark. 646, 543 S.W.2d 459 (1976) (en banc).

It has also been stated that "[t]he ordinary meaning of 'relating to' is that there is a connection between two subjects, not that the subjects have to be the same." *Contractors Ass'n v. West Virginia DPS*, 189 W. Va. at 697, 434 S.E.2d at 369. See, also, *Matter of City of New York (Town of Hempstead)*, 125 A.D. 219, 109 N.Y.S. 652 (1908), *aff'd* 192 N.Y. 569, 85 N.E. 1117, *motion to amend remittitur denied* 194 N.Y. 587, 88 N.E. 1134 (1909).

The clear import of these well-established standards is that the phrase "relating to" is to be read broadly and should be interpreted as being comprehensive of the subject indicated. In this case, the subject indicated is "the conduct of lottery by the sale of pickle cards." See § 9-322(9). In the context of the overall legislative scheme of the Nebraska Pickle Card Lottery Act, the "conduct of lottery" must encompass not only the sale of pickle cards by the licensee, but also the use to which that licensee puts the revenue generated.

In other words, the "conduct of lottery by the sale of pickle cards" includes not only how a licensee makes money, but how a licensee spends money. This, of course, includes charitable donations from a licensee to an eligible nonprofit organization. Documents "relating to" those transactions may be found in the possession of both the pickle card licensee and the recipient of its pickle card funds.

Central States argues that the phrase "of any licensee" contained in § 9-322(9) limits the Department to auditing records in the possession of a licensee. Central States' position is contrary to the language of the statute. The statute provides that the Department may audit "books, papers, records, or memoranda relating to the conduct of lottery by the sale of pickle cards of any licensee." *Id.* The phrase "of any licensee" modifies the

phrase "the conduct of lottery by the sale of pickle cards." Restated, the statute provides that when "any licensee" engages in "the conduct of lottery by the sale of pickle cards," the Department may audit the "books, papers, records, or memoranda relating to" that conduct, regardless of whether the licensee itself possesses the relevant documentation.

Based on the foregoing analysis, we hold that documents belonging to a donee of pickle card proceeds that describe the donee's disposition of those proceeds are documents "relating to the conduct of lottery by the sale of pickle cards" within the meaning of § 9-322(9). This is true regardless of whether the donee is itself licensed to sell pickle cards.

We note, in that regard, that if the Legislature had intended to limit the scope of the Department's audits to pickle card licensees, it could have easily done so. Instead, the unambiguous language of § 9-322(9) defines the scope of the Department's authority to audit, not by reference to the party being audited, but by the nature of the documents being sought. The Department is authorized by the plain language of § 9-322(9) to review any records relating to a licensee's conduct of pickle card sales, and § 9-322(9) contains no limitation premised on the identity of the party holding the records. It is not within the province of a court to read a meaning into a statute that is not warranted by the legislative language; neither is it within the province of a court to read anything plain, direct, and unambiguous out of a statute. *State v. Woods*, 255 Neb. 755, 587 N.W.2d 122 (1998); *Father Flanagan's Boys Home v. Dept. of Soc. Servs.*, 255 Neb. 303, 583 N.W.2d 774 (1998).

This conclusion is also supported when § 9-322 is considered in the larger context of the Nebraska Pickle Card Lottery Act. The components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *In re Invol. Dissolution of Battle Creek State Bank*, 254 Neb. 120, 575 N.W.2d 356 (1998); *SID No. 2 v. County of Stanton*, 252 Neb. 731, 567 N.W.2d 115 (1997). A court will construe statutes relating to the same subject matter together so as to maintain a consistent and sensible scheme. *SID No. 1 v.*

*Nebraska Pub. Power Dist.*, 253 Neb. 917, 573 N.W.2d 460 (1998); *Abboud v. Papio-Missouri River NRD*, 253 Neb. 514, 571 N.W.2d 302 (1997).

For example, it is stated in § 9-302(1), in relevant part:

> The purpose of the Nebraska Pickle Card Lottery Act is to protect the health and welfare of the public, to protect the economic welfare and interest in pickle card sales and winnings, to insure that the profits derived from the operation of lottery by the sale of pickle cards are accurately reported in order that their revenue-raising potential be fully exposed, to insure that the profits are used for legitimate purposes, and to prevent the purposes for which the profits of lottery by the sale of pickle cards are to be used from being subverted by improper elements.

It would be difficult, if not impossible, for the Department to ensure that pickle card profits were "used for legitimate purposes," and to prevent those purposes from being "subverted by improper elements," if the Department is unable to investigate the organizations which received donations from pickle card revenue.

The Nebraska Pickle Card Lottery Act further contains sections that extensively define the purposes for which pickle card profits may lawfully be spent. See, e.g., §§ 9-309, 9-347, 9-347.01, and 9-349. When considered as a whole, the Nebraska Pickle Card Lottery Act, as the district court noted, "evidence[s] a clear concern by the Legislature regarding the ultimate use of pickle card proceeds, even after initial donation by a licensed organization." In construing a statute, a court must look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served, and then must place on the statute a reasonable or liberal construction that best achieves the statute's purpose, rather than a construction that defeats the statutory purpose. *Brown v. Wilson*, 252 Neb. 782, 567 N.W.2d 124 (1997). With that in mind, it is entirely appropriate that § 9-322(9) allows the Department to monitor the disposition of pickle card revenue with reasonable audits of organizations that receive that revenue.

We conclude that the Department is authorized by statute to audit Central States' records relating to its expenditure of

donated pickle card revenue and that the district court was correct in so finding. Accordingly, Central States' assignment of error is without merit.

## PROPRIETY OF INJUNCTIVE RELIEF

Having determined that Central States falls within the scope of § 9-322(9), we must determine whether the provisions of that statute entitle Central States to seek injunctive relief. Specifically, we must decide if the statute provides an adequate remedy at law that would make injunctive relief inappropriate.

It is well established that an injunction is an extraordinary remedy and ordinarily should not be granted except in a clear case where there is actual and substantial injury. Such a remedy should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *State v. World Diversified, Inc.*, 254 Neb. 307, 576 N.W.2d 198 (1998). As noted previously, § 9-322(9) provides that if an entity refuses to honor a request for documents, the Department "may apply to a judge of the district court of the county in which such person resides for an order directing such person to comply with the department's request."

The federal courts have established that while an administrative agency may issue an administrative subpoena without first obtaining a search warrant, in order for the procedure to satisfy the Fourth Amendment to the U.S. Constitution, the subpoenaed party must have the opportunity for judicial review of the subpoena's requirements before suffering any penalties for refusing to comply. See, *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 104 S. Ct. 769, 78 L. Ed. 2d 567 (1984); *See v. City of Seattle*, 387 U.S. 541, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967); *United States v. Powell*, 379 U.S. 48, 85 S. Ct. 248, 13 L. Ed. 2d 112 (1964). This is accomplished by requiring the agency to seek judicial enforcement of a subpoena at a contested hearing. *Id.* At such a hearing, if the subpoenaed party wishes to oppose enforcement, it may raise an appropriate challenge. See, *Donovan v. Lone Steer, Inc., supra; United States v. Powell, supra; United States v. Morton Salt Co.*, 338 U.S. 632, 70 S. Ct. 357, 94 L. Ed. 401 (1950).

The statute at issue in the present case, § 9-322, requires the Department to respond to noncompliance with its request by obtaining judicial enforcement from the district court, thus providing an opportunity for the contested hearing necessary to satisfy Fourth Amendment requirements. Although the statute does not explicitly state that a contested hearing is required before judicial enforcement can be obtained, we read the statute as including the procedural requirements necessary to satisfy the Fourth Amendment. See *id.* See, also, *Southeast Rur. Vol. Fire Dept. v. Neb. Dept. of Rev.*, 251 Neb. 852, 560 N.W.2d 436 (1997); *Callan v. Balka*, 248 Neb. 469, 536 N.W.2d 47 (1995) (holding statutes should be reasonably constructed in way that preserves constitutional validity).

In the instant case, the question is whether Central States could be entitled to injunctive relief even though it is possible to raise its defenses at the district court hearing that is required before the Department may obtain judicial enforcement of its request. An action for injunction sounds in equity, *Putnam v. Fortenberry, ante* p. 266, 589 N.W.2d 838 (1999), and it is well established that equitable remedies are generally not available where there exists an adequate remedy at law. *Vaccaro v. City of Omaha*, 254 Neb. 800, 579 N.W.2d 535 (1998). An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as the remedy in equity. *Id.*

It is equally well established that an adequate remedy at law exists where a statute provides a litigant with an opportunity to raise the issues that would be presented in an injunction action. See, e.g., *id.*; *Clayton v. Nebraska Dept. of Motor Vehicles*, 247 Neb. 49, 524 N.W.2d 562 (1994).

Since § 9-322(9) requires the Department to seek judicial enforcement, and therefore judicial review, of its request for documents prior to enforcement, the statute provides Central States with an adequate remedy at law, and injunctive relief is not available in the instant cause. Stated another way, if the Department pursues its request by seeking judicial enforcement, Central States may raise any of its defenses at the judicial enforcement hearing.

## CONCLUSION

For the foregoing reasons, we conclude that the Department is authorized by § 9-322(9) to audit Central States' records relating to its expenditure of donated pickle card revenue and that the statute provides an adequate remedy at law that precludes Central States' initiation of an action seeking injunctive relief. Accordingly, the district court did not err in determining that the Department was authorized to audit Central States and in denying injunctive relief, and the district court's judgment is affirmed. Having decided that injunctive relief is unavailable to Central States, we need not consider its other assignments of error.

AFFIRMED.